**Appeal No. 13-55553**

---

## IN THE UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

---

**NAME.SPACE, INC.,**

*Plaintiff-Appellant,*

v.

**INTERNET CORPORATION FOR ASSIGNED NAMES AND NUMBERS,**

*Defendant-Appellee.*

---

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
HONORABLE THE HONORABLE PERCY ANDERSON
CASE NO. 2:12-CV-08676-PA-PLA**

---

**APPELLEE'S SUPPLEMENTAL EXCERPT OF RECORD**

---

Jeffrey A. LeVee (125863)
Eric P. Enson (204447)
Kathleen P. Wallace (234949)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, CA  90071.2300
Telephone: +1.213.489.3939
Facsimile:  +1.213.243.2539
E-mail:     jlevee@JonesDay.com

Attorneys for Defendant-Appellee
INTERNET CORPORATION FOR
ASSIGNED NAMES AND NUMBERS

IN THE UNITED STATES COURT OF APPEALS FOR

THE NINTH CIRCUIT

Case No. Appeal No. 13-55553

**SUPPLEMENTAL EXCERPT OF RECORD**

| DATE | DOCUMENT DESCRIPTION | DISTRICT COURT DOCKET NO. | PAGE NO. |
|---|---|---|---|
| 11/30/2012 | DEFENDANT ICANN'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF ITS MOTION TO DISMISS COMPLAINT | 20 | SER001-SER072 |

Dated: November 8, 2013

Respectfully submitted,

Jones Day

By: /s/ Jeffrey A. LeVee

Jeffrey A. LeVee
Eric P. Enson
Kathleen P. Wallace

Attorneys for Defendant-Appellee
INTERNET CORPORATION FOR
ASSIGNED NAMES AND
NUMBERS

1  Jeffrey A. LeVee (State Bar No. 125863)
   jlevee@JonesDay.com
2  Eric P. Enson (State Bar No. 204447)
   epenson@JonesDay.com
3  JONES DAY
   555 South Flower Street
4  Fiftieth Floor
   Los Angeles, CA  90071.2300
5  Telephone:  +1.213.489.3939
   Facsimile:   +1.213.243.2539
6
7  Attorneys for Defendant
   INTERNET CORPORATION FOR
   ASSIGNED NAMES AND NUMBERS
8
9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11                  WESTERN DIVISION

12

13  **NAME.SPACE, INC.,**            **Case No. CV 12-8676-PA**

14          **Plaintiff,**            Assigned for all purposes to the
                                      Honorable Percy Anderson
15       **v.**
                                      **DEFENDANT ICANN'S**
16  **INTERNET CORPORATION FOR**      **REQUEST FOR JUDICIAL**
    **ASSIGNED NAMES AND**            **NOTICE IN SUPPORT OF ITS**
17  **NUMBERS,**                      **MOTION TO DISMISS**
                                      **COMPLAINT**
18          **Defendant.**
                                      [Notice of Motion and Motion to
19                                    Dismiss Complaint; Memorandum of
                                      Points and Authorities; and
20                                    [Proposed] Order Filed, Served and
                                      Lodged Concurrently Herewith]
21
22                                    Hearing Date:  Feb. 11, 2013
23                                    Hearing Time:  1:30 p.m.
                                      Hearing Location: 312 N. Spring St.
24

25

26

27

28

1    PLEASE TAKE NOTICE that, pursuant to Federal Rule of Evidence 201,

2  Defendant Internet Corporation for Assigned Names and Numbers ("ICANN")

3  hereby respectfully requests that, in considering its concurrently-filed Motion to

4  Dismiss Plaintiff's Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6)

5  and 12(b)(1), the Court take judicial notice of the following documents:

6         (A)    **Articles of Incorporation for ICANN**, as revised
         effective November 21, 1998, available at
7         http://www.icann.org/en/general/articles.htm, a true and
         correct copy of which is attached hereto as Exhibit A;
8
         (B)    **Bylaws for ICANN**, as amended effective
9         December 8, 2011, available at
         http://www.icann.org/en/general/bylaws.htm, a true and
10        correct copy of which is attached hereto as Exhibit B; and

11        (C)    **Unsponsored TLD Application Transmittal
         Form**, executed by Plaintiff name.space, Inc.
12        ("name.space") on October 6, 2000, a true and correct
         copy of which is attached hereto as Exhibit C.
13
     Name.space references these documents both directly and indirectly in its
14
   Complaint without raising any question as to the authenticity of these documents.
15
   Further, these documents constitute facts not reasonably subject to dispute.
16
   Accordingly, they may be properly considered in connection with ICANN's Motion
17
   to Dismiss name.space's Complaint.
18
                              **LEGAL STANDARD**
19
        "[A] district court ruling on a motion to dismiss may consider a document the
20
   authenticity of which is not contested, and upon which the plaintiff's complaint
21
   necessarily relies." *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998),
22
   superseded by statute on other grounds; *see also Van Buskirk v. CNN*, 284 F.3d 977,
23
   980 (9th Cir. 2002) (ruling that under the Ninth Circuit's "incorporation by
24
   reference" rule, a court may look beyond the pleadings without converting the Rule
25
   12(b)(6) motion into one for summary judgment). This includes documents that are
26
   relied upon by the plaintiff, but not explicitly incorporated in the complaint nor
27
   attached thereto. *Van Buskirk*, 284 F.3d at 980; *see also Neilson v. Union Bank of*
28

1   *Cal., N.A.*, 290 F. Supp. 2d 1101, 1114 (C.D. Cal. 2003) (taking judicial notice of

2   signed contracts relied upon in the complaint but not incorporated); *In re*

3   *Northpoint Commc'ns. Group, Inc., Secs. Litig.*, 221 F. Supp. 2d 1090, 1095 (N.D.

4   Cal. 2002) ("In ruling on a motion to dismiss, a court may take judicial notice of a

5   document if it is relied on in the complaint (regardless of whether it is expressly

6   incorporated therein) and its authenticity is not disputed."); *In re Silicon Graphics*

7   *Securities Litigation*, 183 F.3d 970, 986 (9th Cir. 1999), superseded by statute on

8   other grounds (considering SEC filings referenced within a complaint when ruling

9   on a 12(b)(6) motion to dismiss); *Parrino*, 146 F.3d at 706 (on motion to dismiss,

10  court may consider documents not attached to complaint yet crucial to a claim);

11  *Branch v. Tunnell*, 14 F.3d 449, 453-54 (9th Cir. 1994) overruled on other grounds

12  by *Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119, 1127 (9th Cir. 2002)

13  (approving of consideration of documents mentioned in complaint when ruling on a

14  12(b)(6) motion).

15      Under Federal Rule of Evidence 201, a fact is judicially noticeable when it is

16  not subject to reasonable dispute and is capable of accurate and ready determination

17  by resort to sources whose accuracy cannot reasonably be questioned.  Information

18  obtained from a website where neither party questions the authenticity of the site, or

19  the document meets the definition of Fed. R. Evid. 201, is a proper subject of

20  judicial notice.  *Pollstar v. Gigmania Ltd.*, 170 F. Supp. 2d 974, 978 (E.D. Cal.

21  2000) (taking judicial notice of website printout referenced in complaint when

22  ruling on motion to dismiss); *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218,

23  1224-25 (10th Cir. 2007) (taking judicial notice of website and information

24  contained therein and collecting cases regarding propriety of same).

25                              **ARGUMENT**

26      The allegations in name.space's Complaint are inextricably intertwined with

27  the following documents that this Court may judicially notice.  Judicial notice of

28  these documents is necessary to give the Court a more complete understanding of

1  the facts upon which name.space's claims rests and may be dispositive to ICANN's

2  Motion to Dismiss.

3  **ICANN's Articles of Incorporation (Exhibit A)**

4     Name.space's Complaint necessarily implicates ICANN's Articles of

5  Incorporation, as it discusses ICANN's operation as a "no-for-profit entity

6  responsible for coordinating the technical management of the Internet's domain

7  name system (DNS) and for ensuring its continued security, stability and integrity."

8  (Compl. ¶ 36.)  In addition, name.space's Complaint repeatedly refers to ICANN's

9  core functions and mission, which are set forth in its Articles of Incorporation.

10  (Compl. ¶¶ 19, 35-42.)  Because ICANN's Articles of Incorporation  are pertinent

11  to name.space's claims, are not subject to reasonable dispute, and are publicly

12  available on ICANN's web site (http://www.icann.org/en/general/articles.htm),

13  ICANN's Articles of Incorporation, attached hereto as Exhibit A, may be

14  considered in the determination of ICANN's Motion to Dismiss. *Parrino*, 146 F.3d

15  at 706.

16  **ICANN's Bylaws (Exhibit B)**

17     Name.space's Complaint necessarily implicates ICANN's Bylaws, as it

18  discusses the scope of ICANN's responsibilities in coordinating the domain name

19  system and ICANN's contractual and remedial power over other entities.  (Compl.

20  ¶¶ 35-42.)  These missions and powers, as well as its policy development process,

21  are set forth in ICANN's Bylaws.  Because ICANN's Bylaws are pertinent to

22  name.space's claims, not subject to reasonable dispute, and are publicly available

23  on ICANN's web site (http://www.icann.org/en/general/bylaws.htm), ICANN's

24  Bylaws, attached hereto as Exhibit B, may be considered in the determination of

25  ICANN's Motion to Dismiss. *Parrino*, 146 F.3d at 706.  Indeed, previous iterations

26  of ICANN's Bylaws have been determined to be proper subjects of judicial notice.

27  *Verisign, Inc. v. Internet Corp. for Assigned Names & Numbers*, Case No. CV 04-

28  1292 AHM (CTx), 2004 U.S. Dist. LEXIS 17330 (C.D. Cal. Aug. 26, 2004) (taking

ICANN'S RJN IN SUPPORT OF
MOTION TO DISMISS COMPLAINT
CV12-8676-PA

1   judicial notice of earlier version of Bylaws when granting Rule 12(b)(6) motion).

2   **Name.space's 2000 Unsponsored TLD Application (Exhibit C)**

3        Name.space's 2000 application to operate various top-level domains

4   ("TLDs") within the Internet's domain name system, which is entitled Unsponsored

5   TLD Application Transmittal Form ("2000 Application"), is central to

6   name.space's Complaint and claims set forth therein. (Compl. ¶¶ 45-58.) For

7   instance, in describing its injury, name.space alleges that "ICANN's refusal to

8   delegate name.space's gTLDs to the DNS under its 2000 Application has enabled

9   and induced 2012 applicants to apply for delegation of those gTLDs as part of the

10  2012 Application Round." (Compl. ¶ 90.) Name.space specifically alleges that it

11  "submitted a complete and timely application with ICANN to operate as the

12  registry for 118 gTLDs, and paid the $50,000 application fee." (*Id*. ¶ 50.)

13  Name.space complains that "ICANN knowingly and willingly created the

14  application process for the 2012 Application Round without adequate safeguards in

15  place to protect the 2000 applicants' rights in their proposed or already operating

16  TLDs." (*Id*. ¶ 73.) In fact, name.space alleges that it "continues to seek delegation

17  of its 118 gTLDs from its 2000 Application." (*Id*. ¶ 75.)

18       Thus, there is no question that its 2000 Application is central to name.space's

19  claims and subject to judicial notice, even though it is not attached to, or

20  incorporated in, the Complaint. *Neilson*, 290 F. Supp. 2d at 1114 (taking judicial

21  notice of signed contracts relied upon in the complaint but not incorporated or

22  attached). Moreover, the authenticity of the 2000 Application is beyond dispute. It

23  is, in fact, signed by Mr. Paul Garrin, who name.space alleges in the Complaint is

24  the founder of name.space. (Compl. ¶ 32.)

25       Finally, it is in the interests of justice that the Court take judicial notice of the

26  2000 Application in that it contains a complete and full release of ICANN, which

27  ICANN argues in its Motion to Dismiss bars name.space's entire Complaint. As

28  the *Parrino* court explained, the policy justification for the rule permitting court's

ICANN'S RJN IN SUPPORT OF
MOTION TO DISMISS COMPLAINT
CV12-8676-PA

LAI-3180697v1

- 4 -

1  to judicially notice signed contracts not attached or incorporated in a complaint is:

2  "preventing plaintiffs from surviving a Rule 12(b)(6) motion by deliberately

3  omitting references to documents upon which their claims are based." *Parrino*, 146

4  F.3d at 706; *see also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d

5  Cir. 1991) (". . . we have held that when a plaintiff chooses not to attach to the

6  complaint or incorporate by reference a prospectus upon which it solely relies and

7  which is integral to the complaint, the defendant may produce the prospectus when

8  attacking the complaint for its failure to state a claim, because plaintiff should not

9  so easily be allowed to escape the consequences of its own failure.").

10  Name.space's 2000 Application, and its release of ICANN, should be considered on

11  ICANN's Motion to Dismiss for the same reasons.

12       The 2000 Application is thus pertinent to name.space's claims, not subject to

13  reasonable dispute, and is critical to disposition of ICANN's Motion to Dismiss.

14  Therefore, the 2000 Application, attached hereto as Exhibit C, may be considered in

15  the determination of ICANN's Motion to Dismiss. *Parrino*, 146 F.3d at 706.

16  **CONCLUSION**

17       For the foregoing reasons, ICANN respectfully requests that the Court take

18  judicial notice of and consider Exhibits A-C, attached hereto, in determination of

19  ICANN's Motion to Dismiss.

20

21  Dated:  November 30, 2012          JONES DAY

22

23                         By: /s/ Eric P. Enson
                          Eric P. Enson

24                         Attorneys for Defendant

25                         INTERNET CORPORATION FOR
                       ASSIGNED NAMES AND NUMBERS

26

27

28

# EXHIBIT A

- Documents
-

**Governance Documents**

Articles of Incorporation

**Board Meeting Transcripts, Minutes & Resolutions**

**Bylaws and Bylaws Archives**

**Board Code of Conduct**

**Board Conflicts of Interest Policy**

**Board Statements of Interest**

**General Documents**

**Major Agreements**

**Accountability and Transparency**

**Affirmation of Commitments**

**Annual Report**

**Budget (can now be found under Financial Information)**

**Correspondence**

**Expected Standards of Behavior [PDF, 106 KB]**

**Financial Information**

**Documentary Information Disclosure Policy**

**Litigation**

**Monthly Registry Reports**

**Notices of Breach, Termination and Non-Renewal**

**Operating Plan (can now be found under Strategic and Operating Plan)**

**Partnership Memorandums of Understanding**

**Policy**

**Requests for Proposals (RFPs)**

**Speeches and Presentations**

**Strategic and Operating Plan**

**Vint Cerf's Legacy Letter to ICANN Community**

**Wiki Resolutions Project**

# ARTICLES OF INCORPORATION OF INTERNET CORPORATION FOR ASSIGNED NAMES AND NUMBERS

*21 November 2008*

As Revised November 21, 1998

1. The name of this corporation is Internet Corporation for Assigned Names and Numbers (the "Corporation").

Case: 13-55553    11/08/2013    ID: 8857379    DktEntry: 15-2    Page: 11 of 74

2. The name of the Corporation's initial agent for service of process in the State of California, United States of America is C T Corporation System.

3. This Corporation is a nonprofit public benefit corporation and is not organized for the private gain of any person. It is organized under the California Nonprofit Public Benefit Corporation Law for charitable and public purposes. The Corporation is organized, and will be operated, exclusively for charitable, educational, and scientific purposes within the meaning of § 501 (c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"), or the corresponding provision of any future United States tax code. Any reference in these Articles to the Code shall include the corresponding provisions of any further United States tax code. In furtherance of the foregoing purposes, and in recognition of the fact that the Internet is an international network of networks, owned by no single nation, individual or organization, the Corporation shall, except as limited by Article 5 hereof, pursue the charitable and public purposes of lessening the burdens of government and promoting the global public interest in the operational stability of the Internet by (i) coordinating the assignment of Internet technical parameters as needed to maintain universal connectivity on the Internet; (ii) performing and overseeing functions related to the coordination of the Internet Protocol ("IP") address space; (iii) performing and overseeing functions related to the coordination of the Internet domain name system ("DNS"), including the development of policies for determining the circumstances under which new top-level domains are added to the DNS root system; (iv) overseeing operation of the authoritative Internet DNS root server system; and (v) engaging in any other related lawful activity in furtherance of items (i) through (iv).

4. The Corporation shall operate for the benefit of the Internet community as a whole, carrying out its activities in conformity with relevant principles of international law and applicable international conventions and local law and, to the extent appropriate and consistent with these Articles and its Bylaws, through open and transparent processes that enable competition and open entry in Internet-related markets. To this effect, the Corporation shall cooperate as appropriate with relevant international organizations.

5. Notwithstanding any other provision (other than Article 8) of these Articles:

    a. The Corporation shall not carry on any other activities not permitted to be carried on (i) by a corporation exempt from United States income tax under § 501 (c)(3) of the Code or (ii) by a corporation, contributions to which are deductible under § 170 (c)(2) of the Code.

    b. No substantial part of the activities of the Corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation, and the Corporation shall be empowered to make the election under § 501 (h) of the Code.

    c. The Corporation shall not participate in, or intervene in (including the publishing or distribution of statements) any political campaign on behalf of or in opposition to any candidate for public office.

    d. No part of the net earnings of the Corporation shall inure to the benefit of or be distributable to its members, directors, trustees, officers, or other private persons, except that the Corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes set forth in Article 3 hereof.

    e. In no event shall the Corporation be controlled directly or indirectly by one or more "disqualified persons" (as defined in § 4946 of the Code) other than foundation managers and other than one or more organizations described in paragraph (1) or (2) of § 509 (a) of the Code.

6. To the full extent permitted by the California Nonprofit Public Benefit Corporation Law or any other applicable laws presently or hereafter in effect, no director of the Corporation shall be personally liable to the Corporation or its members, should the Corporation elect to have members in the future, for or with respect to any acts or omissions in the performance of his or her duties as a director of the Corporation. Any repeal or modification of this Article 6 shall not adversely affect any right or protection of a director of the Corporation existing immediately prior to such repeal or modification.

7. Upon the dissolution of the Corporation, the Corporation's assets shall be distributed for one or more of the exempt purposes set forth in Article 3 hereof and, if possible, to a § 501 (c)(3) organization organized and operated exclusively to lessen the burdens of government and promote the global public interest in the operational stability of the Internet, or shall be distributed to a governmental entity for such purposes, or for such other charitable and public purposes that lessen the burdens of government by providing for the operational stability of the Internet. Any assets not so disposed of shall be disposed of by a court of competent jurisdiction of the county in which the principal office of the Corporation is then

EXHIBIT A
7

SER009

located, exclusively for such purposes or to such organization or organizations, as such court shall determine, that are organized and operated exclusively for such purposes, unless no such corporation exists, and in such case any assets not disposed of shall be distributed to a § 501(c)(3) corporation chosen by such court.

8. Notwithstanding anything to the contrary in these Articles, if the Corporation determines that it will not be treated as a corporation exempt from federal income tax under § 501(c)(3) of the Code, all references herein to § 501(c)(3) of the Code shall be deemed to refer to § 501(c)(6) of the Code and Article 5(a)(ii), (b), (c) and (e) shall be deemed not to be a part of these Articles.

9. These Articles may be amended by the affirmative vote of at least two-thirds of the directors of the Corporation. When the Corporation has members, any such amendment must be ratified by a two-thirds (2/3) majority of the members voting on any proposed amendment.

EXHIBIT A

8

EXHIBIT B

- Documents
- 

**Governance Documents**

  Articles of Incorporation

  Board Meeting Transcripts, Minutes & Resolutions

  Bylaws and Bylaws Archives

  Board Code of Conduct

  Board Conflicts of Interest Policy

  Board Statements of Interest

**General Documents**

  Major Agreements

  Accountability and Transparency

  Affirmation of Commitments

  Annual Report

  Budget (can now be found under Financial Information)

  Correspondence

  Expected Standards of Behavior [PDF, 106 KB]

  Financial Information

  Documentary Information Disclosure Policy

  Litigation

  Monthly Registry Reports

  Notices of Breach, Termination and Non-Renewal

  Operating Plan (can now be found under Strategic and Operating Plan)

  Partnership Memorandums of Understanding

  Policy

  Requests for Proposals (RFPs)

  Speeches and Presentations

  Strategic and Operating Plan

  Vint Cerf's Legacy Letter to ICANN Community

  Wiki Resolutions Project

# BYLAWS FOR INTERNET CORPORATION FOR ASSIGNED NAMES AND NUMBERS

A California Nonprofit Public-Benefit Corporation

*As amended 8 December 2011*

## TABLE OF CONTENTS

EXHIBIT B

Case: 13-55553   11/08/2013   ID: 8857379   DktEntry: 15-2   Page: 15 of 74
Case 2:12-cv-08676-PA-PLA   Document 20   Filed 11/30/12   Page 13 of 72   Page ID #:145

ARTICLE I: MISSION AND CORE VALUES
ARTICLE II: POWERS
ARTICLE III: TRANSPARENCY
ARTICLE IV: ACCOUNTABILITY AND REVIEW
ARTICLE V: OMBUDSMAN
ARTICLE VI: BOARD OF DIRECTORS
ARTICLE VII: NOMINATING COMMITTEE
ARTICLE VIII: ADDRESS SUPPORTING ORGANIZATION
ARTICLE IX: COUNTRY-CODE NAMES SUPPORTING ORGANIZATION
ARTICLE X: GENERIC NAMES SUPPORTING ORGANIZATION
ARTICLE XI: ADVISORY COMMITTEES
ARTICLE XI-A: OTHER ADVISORY MECHANISMS
ARTICLE XII: BOARD AND TEMPORARY COMMITTEES
ARTICLE XIII: OFFICERS
ARTICLE XIV: INDEMNIFICATION OF DIRECTORS, OFFICERS, EMPLOYEES, AND OTHER AGENTS
ARTICLE XV: GENERAL PROVISIONS
ARTICLE XVI: FISCAL MATTERS
ARTICLE XVII: MEMBERS
ARTICLE XVIII: OFFICES AND SEAL
ARTICLE XIX: AMENDMENTS
ARTICLE XX: TRANSITION ARTICLE
ANNEX A: GNSO POLICY DEVELOPMENT PROCESS
ANNEX B: ccNSO POLICY-DEVELOPMENT PROCESS (ccPDP)
ANNEX C: THE SCOPE OF THE ccNSO

# ARTICLE I: MISSION AND CORE VALUES

**Section 1. MISSION**

The mission of The Internet Corporation for Assigned Names and Numbers ("ICANN") is to coordinate, at the overall level, the global Internet's systems of unique identifiers, and in particular to ensure the stable and secure operation of the Internet's unique identifier systems. In particular, ICANN:

> 1. Coordinates the allocation and assignment of the three sets of unique identifiers for the Internet, which are
>
> > a. Domain names (forming a system referred to as "DNS");
> >
> > b. Internet protocol ("IP") addresses and autonomous system ("AS") numbers; and
> >
> > c. Protocol port and parameter numbers.
>
> 2. Coordinates the operation and evolution of the DNS root name server system.
>
> 3. Coordinates policy development reasonably and appropriately related to these technical functions.

**Section 2. CORE VALUES**

In performing its mission, the following core values should guide the decisions and actions of ICANN:

> 1. Preserving and enhancing the operational stability, reliability, security, and global interoperability of the Internet.
>
> 2. Respecting the creativity, innovation, and flow of information made possible by the Internet by limiting ICANN's activities to those matters within ICANN's mission requiring or significantly benefiting from global coordination.
>
> 3. To the extent feasible and appropriate, delegating coordination functions to or recognizing the policy role of other responsible entities that reflect the interests of affected parties.

Case 2:12-cv-08676-PA-PLA     Document 20     Filed 11/30/12     Page 14 of 72     Page ID #:146

4. Seeking and supporting broad, informed participation reflecting the functional, geographic, and cultural diversity of the Internet at all levels of policy development and decision-making.

5. Where feasible and appropriate, depending on market mechanisms to promote and sustain a competitive environment.

6. Introducing and promoting competition in the registration of domain names where practicable and beneficial in the public interest.

7. Employing open and transparent policy development mechanisms that (i) promote well-informed decisions based on expert advice, and (ii) ensure that those entities most affected can assist in the policy development process.

8. Making decisions by applying documented policies neutrally and objectively, with integrity and fairness.

9. Acting with a speed that is responsive to the needs of the Internet while, as part of the decision-making process, obtaining informed input from those entities most affected.

10. Remaining accountable to the Internet community through mechanisms that enhance ICANN's effectiveness.

11. While remaining rooted in the private sector, recognizing that governments and public authorities are responsible for public policy and duly taking into account governments' or public authorities' recommendations.

These core values are deliberately expressed in very general terms, so that they may provide useful and relevant guidance in the broadest possible range of circumstances. Because they are not narrowly prescriptive, the specific way in which they apply, individually and collectively, to each new situation will necessarily depend on many factors that cannot be fully anticipated or enumerated; and because they are statements of principle rather than practice, situations will inevitably arise in which perfect fidelity to all eleven core values simultaneously is not possible. Any ICANN body making a recommendation or decision shall exercise its judgment to determine which core values are most relevant and how they apply to the specific circumstances of the case at hand, and to determine, if necessary, an appropriate and defensible balance among competing values.

# ARTICLE II: POWERS

### Section 1. GENERAL POWERS

Except as otherwise provided in the Articles of Incorporation or these Bylaws, the powers of ICANN shall be exercised by, and its property controlled and its business and affairs conducted by or under the direction of, the Board. With respect to any matters that would fall within the provisions of Article III, Section 6, the Board may act only by a majority vote of all members of the Board. In all other matters, except as otherwise provided in these Bylaws or by law, the Board may act by majority vote of those present at any regular, regular, or special meeting of the Board. Any references in these Bylaws to a vote of the Board shall mean the vote of only those members present at the meeting where a quorum is present unless otherwise specifically provided in these Bylaws by reference to "all of the members of the Board."

### Section 2. RESTRICTIONS

ICANN shall not act as a Domain Name System Registry or Registrar or Internet Protocol Address Registry in competition with entities affected by the policies of ICANN. Nothing in this Section is intended to prevent ICANN from taking whatever steps are necessary to protect the operational stability of the Internet in the event of financial failure of a Registry or Registrar or other emergency.

### Section 3. NON-DISCRIMINATORY TREATMENT

ICANN shall not apply its standards, policies, procedures, or practices inequitably or single out any particular party for disparate treatment unless justified by substantial and reasonable cause, such as the promotion of effective competition.

EXHIBIT B
11

SER014 1/20/2012

Case: 13-55553    11/08/2013    ID: 8857379    DktEntry: 15-2    Page: 17 of 74
Case 2:12-cv-08676-PA-PLA    Document 20    Filed 11/30/12    Page 15 of 72    Page ID #:147

# ARTICLE III: TRANSPARENCY

## Section 1. PURPOSE

ICANN and its constituent bodies shall operate to the maximum extent feasible in an open and transparent manner and consistent with procedures designed to ensure fairness.

## Section 2. WEBSITE

ICANN shall maintain a publicly-accessible Internet World Wide Web site (the "Website"), which may include, among other things, (i) a calendar of scheduled meetings of the Board, Supporting Organizations, and Advisory Committees; (ii) a docket of all pending policy development matters, including their schedule and current status; (iii) specific meeting notices and agendas as described below; (iv) information on ICANN's budget, annual audit, financial contributors and the amount of their contributions, and related matters; (v) information about the availability of accountability mechanisms, including reconsideration, independent review, and Ombudsman activities, as well as information about the outcome of specific requests and complaints invoking these mechanisms; (vi) announcements about ICANN activities of interest to significant segments of the ICANN community; (vii) comments received from the community on policies being developed and other matters; (viii) information about ICANN's physical meetings and public forums; and (ix) other information of interest to the ICANN community.

## Section 3. MANAGER OF PUBLIC PARTICIPATION

There shall be a staff position designated as Manager of Public Participation, or such other title as shall be determined by the President, that shall be responsible, under the direction of the President, for coordinating the various aspects of public participation in ICANN, including the Website and various other means of communicating with and receiving input from the general community of Internet users.

## Section 4. MEETING NOTICES AND AGENDAS

At least seven days in advance of each Board meeting (or if not practicable, as far in advance as is practicable), a notice of such meeting and, to the extent known, an agenda for the meeting shall be posted.

## Section 5. MINUTES AND PRELIMINARY REPORTS

1. All minutes of meetings of the Board and Supporting Organizations (and any councils thereof) shall be approved promptly by the originating body and provided to the ICANN Secretary for posting on the Website.

2. No later than 11:59 p.m. on the second business days after the conclusion of each meeting (as calculated by local time at the location of ICANN's principal office), any resolutions passed by the Board of Directors at that meeting shall be made publicly available on the Website; provided, however, that any actions relating to personnel or employment matters, legal matters (to the extent the Board determines it is necessary or appropriate to protect the interests of ICANN), matters that ICANN is prohibited by law or contract from disclosing publicly, and other matters that the Board determines, by a three-quarters (3/4) vote of Directors present at the meeting and voting, are not appropriate for public distribution, shall not be included in the preliminary report made publicly available. The Secretary shall send notice to the Board of Directors and the Chairs of the Supporting Organizations (as set forth in Articles VIII - X of these Bylaws) and Advisory Committees (as set forth in Article XI of these Bylaws) informing them that the resolutions have been posted.

3. No later than 11:59 p.m. on the seventh business days after the conclusion of each meeting (as calculated by local time at the location of ICANN's principal office), any actions taken by the Board shall be made publicly available in a preliminary report on the Website, subject to the limitations on disclosure set forth in Section 5.2 above. For any matters that the Board determines not to disclose, the Board shall describe in general terms in the relevant preliminary report the reason for such nondisclosure.

4. No later than the day after the date on which they are formally approved by the Board (or, if such day is not a business day, as calculated by local time at the location of ICANN's principal office, then the next immediately following business day), the minutes shall be made publicly available on the Website; provided, however, that any minutes relating to personnel or employment matters, legal matters (to the extent the Board determines it is necessary or appropriate to protect the interests of ICANN), matters that ICANN is

EXHIBIT B
12

10/15/2012

prohibited by law or contract from disclosing publicly, and other matters that the Board determines, by a three-quarters (3/4) vote of Directors present at the meeting and voting, are not appropriate for public distribution, shall not be included in the minutes made publicly available. For any matters that the Board determines not to disclose, the Board shall describe in general terms in the relevant minutes the reason for such nondisclosure.

## Section 6. NOTICE AND COMMENT ON POLICY ACTIONS

1. With respect to any policies that are being considered by the Board for adoption that substantially affect the operation of the Internet or third parties, including the imposition of any fees or charges, ICANN shall:

    a. provide public notice on the Website explaining what policies are being considered for adoption and why, at least twenty-one days (and if practical, earlier) prior to any action by the Board;

    b. provide a reasonable opportunity for parties to comment on the adoption of the proposed policies, to see the comments of others, and to reply to those comments, prior to any action by the Board; and

    c. in those cases where the policy action affects public policy concerns, to request the opinion of the Governmental Advisory Committee and take duly into account any advice timely presented by the Governmental Advisory Committee on its own initiative or at the Board's request.

2. Where both practically feasible and consistent with the relevant policy development process, an in-person public forum shall also be held for discussion of any proposed policies as described in Section 6(1)(b) of this Article, prior to any final Board action.

3. After taking action on any policy subject to this Section, the Board shall publish in the meeting minutes the reasons for any action taken, the vote of each Director voting on the action, and the separate statement of any Director desiring publication of such a statement.

## Section 7. TRANSLATION OF DOCUMENTS

As appropriate and to the extent provided in the ICANN budget, ICANN shall facilitate the translation of final published documents into various appropriate languages.

# ARTICLE IV: ACCOUNTABILITY AND REVIEW

## Section 1. PURPOSE

In carrying out its mission as set out in these Bylaws, ICANN should be accountable to the community for operating in a manner that is consistent with these Bylaws, and with due regard for the core values set forth in Article I of these Bylaws. The provisions of this Article, creating processes for reconsideration and independent review of ICANN actions and periodic review of ICANN's structure and procedures, are intended to reinforce the various accountability mechanisms otherwise set forth in these Bylaws, including the transparency provisions of Article III and the Board and other selection mechanisms set forth throughout these Bylaws.

## Section 2. RECONSIDERATION

1. ICANN shall have in place a process by which any person or entity materially affected by an action of ICANN may request review or reconsideration of that action by the Board.

2. Any person or entity may submit a request for reconsideration or review of an ICANN action or inaction ("Reconsideration Request") to the extent that he, she, or it have been adversely affected by:

    a. one or more staff actions or inactions that contradict established ICANN policy(ies); or

EXHIBIT B

13

SER016

Case: 13-55553    11/08/2013    ID: 8857379    DktEntry: 15-2    Page: 19 of 74

b. one or more actions or inactions of the ICANN Board that have been taken or refused to be taken without consideration of material information, except where the party submitting the request could have submitted, but did not submit, the information for the Board's consideration at the time of action or refusal to act.

3. The Board has designated the Board Governance Committee to review and consider any such Reconsideration Requests. The Board Governance Committee shall have the authority to:

    a. evaluate requests for review or reconsideration;

    b. determine whether a stay of the contested action pending resolution of the request is appropriate;

    c. conduct whatever factual investigation is deemed appropriate;

    d. request additional written submissions from the affected party, or from other parties; and

    e. make a recommendation to the Board of Directors on the merits of the request.

4. ICANN shall absorb the normal administrative costs of the reconsideration process. It reserves the right to recover from a party requesting review or reconsideration any costs which are deemed to be extraordinary in nature. When such extraordinary costs can be foreseen, that fact and the reasons why such costs are necessary and appropriate to evaluating the Reconsideration Request shall be communicated to the party seeking reconsideration, who shall then have the option of withdrawing the request or agreeing to bear such costs.

5. All Reconsideration Requests must be submitted to an e-mail address designated by the Board Governance Committee within thirty days after:

    a. for requests challenging Board actions, the date on which information about the challenged Board action is first published in a preliminary report or minutes of the Board's meetings; or

    b. for requests challenging staff actions, the date on which the party submitting the request became aware of, or reasonably should have become aware of, the challenged staff action; or

    c. for requests challenging either Board or staff inaction, the date on which the affected person reasonably concluded, or reasonably should have concluded, that action would not be taken in a timely manner.

6. All Reconsideration Requests must include the information required by the Board Governance Committee, which shall include at least the following information:

    a. name, address, and contact information for the requesting party, including postal and e-mail addresses;

    b. the specific action or inaction of ICANN for which review or reconsideration is sought;

    c. the date of the action or inaction;

    d. the manner by which the requesting party will be affected by the action or inaction;

    e. the extent to which, in the opinion of the party submitting the Request for Reconsideration, the action or inaction complained of adversely affects others;

    f. whether a temporary stay of any action complained of is requested, and if so, the harms that will result if the action is not stayed;

    g. in the case of staff action or inaction, a detailed explanation of the facts as presented to the

EXHIBIT B
14

staff and the reasons why the staff's action or inaction was inconsistent with established ICANN policy(ies);

h. in the case of Board action or inaction, a detailed explanation of the material information not considered by the Board and, if the information was not presented to the Board, the reasons the party submitting the request did not submit it to the Board before it acted or failed to act;

i. what specific steps the requesting party asks ICANN to take-i.e., whether and how the action should be reversed, cancelled, or modified, or what specific action should be taken;

j. the grounds on which the requested action should be taken; and

k. any documents the requesting party wishes to submit in support of its request.

7. All Reconsideration Requests shall be posted on the Website..

8. The Board Governance Committee shall have authority to consider Reconsideration Requests from different parties in the same proceeding so long as (i) the requests involve the same general action or inaction and (ii) the parties submitting Reconsideration Requests are similarly affected by such action or inaction.

9. The Board Governance Committee shall review Reconsideration Requests promptly upon receipt and announce, within thirty days, its intention to either decline to consider or proceed to consider a Reconsideration Request after receipt of the Request. The announcement shall be posted on the Website.

10. The Board Governance Committee announcement of a decision not to hear a Reconsideration Request must contain an explanation of the reasons for its decision.

11. The Board Governance Committee may request additional information or clarifications from the party submitting the Request for Reconsideration.

12. The Board Governance Committee may ask the ICANN staff for its views on the matter, which comments shall be made publicly available on the Website.

13. If the Board Governance Committee requires additional information, it may elect to conduct a meeting with the party seeking Reconsideration by telephone, e-mail or, if acceptable to the party requesting reconsideration, in person. To the extent any information gathered in such a meeting is relevant to any recommendation by the Board Governance Committee, it shall so state in its recommendation.

14. The Board Governance Committee may also request information relevant to the request from third parties. To the extent any information gathered is relevant to any recommendation by the Board Governance Committee, it shall so state in its recommendation.

15. The Board Governance Committee shall act on a Reconsideration Request on the basis of the public written record, including information submitted by the party seeking reconsideration or review, by the ICANN staff, and by any third party.

16. To protect against abuse of the reconsideration process, a request for reconsideration may be dismissed by the Board Governance Committee where it is repetitive, frivolous, non-substantive, or otherwise abusive, or where the affected party had notice and opportunity to, but did not, participate in the public comment period relating to the contested action, if applicable. Likewise, the Board Governance Committee may dismiss a request when the requesting party does not show that it will be affected by ICANN's action.

17. The Board Governance Committee shall make a final recommendation to the Board with respect to a Reconsideration Request within ninety days following its receipt of the request, unless impractical, in which case it shall report to the Board the circumstances that prevented it from making a final recommendation and its best estimate of the time required to produce such a final recommendation. The final recommendation shall be posted on the Website.

EXHIBIT B<br>15

SER018

Case: 13-55553    11/08/2013    ID: 8857379    DktEntry: 15-2    Page: 21 of 74

18. The Board shall not be bound to follow the recommendations of the Board Governance Committee. The final decision of the Board shall be made public as part of the preliminary report and minutes of the Board meeting at which action is taken.

19. The Board Governance Committee shall submit a report to the Board on an annual basis containing at least the following information for the preceding calendar year:

> a. the number and general nature of Reconsideration Requests received;

> b. the number of Reconsideration Requests on which the Board Governance Committee has taken action;

> c. the number of Reconsideration Requests that remained pending at the end of the calendar year and the average length of time for which such Reconsideration Requests have been pending;

> d. a description of any Reconsideration Requests that were pending at the end of the calendar year for more than ninety (90) days and the reasons that the Board Governance Committee has not taken action on them;

> e. the number and nature of Reconsideration Requests that the Board Governance Committee declined to consider on the basis that they did not meet the criteria established in this policy;

> f. for Reconsideration Requests that were denied, an explanation of any other mechanisms available to ensure that ICANN is accountable to persons materially affected by its decisions; and

> g. whether or not, in the Board Governance Committee's view, the criteria for which reconsideration may be requested should be revised, or another process should be adopted or modified, to ensure that all persons materially affected by ICANN decisions have meaningful access to a review process that ensures fairness while limiting frivolous claims.

20. Each annual report shall also aggregate the information on the topics listed in paragraph 19(a)-(e) of this Section for the period beginning 1 January 2003.

## Section 3. INDEPENDENT REVIEW OF BOARD ACTIONS

1. In addition to the reconsideration process described in Section 2 of this Article, ICANN shall have in place a separate process for independent third-party review of Board actions alleged by an affected party to be inconsistent with the Articles of Incorporation or Bylaws.

2. Any person materially affected by a decision or action by the Board that he or she asserts is inconsistent with the Articles of Incorporation or Bylaws may submit a request for independent review of that decision or action.

3. Requests for such independent review shall be referred to an Independent Review Panel ("IRP"), which shall be charged with comparing contested actions of the Board to the Articles of Incorporation and Bylaws, and with declaring whether the Board has acted consistently with the provisions of those Articles of Incorporation and Bylaws.

4. The IRP shall be operated by an international arbitration provider appointed from time to time by ICANN ("the IRP Provider") using arbitrators under contract with or nominated by that provider.

5. Subject to the approval of the Board, the IRP Provider shall establish operating rules and procedures, which shall implement and be consistent with this Section 3.

6. Either party may elect that the request for independent review be considered by a three-member panel; in the absence of any such election, the issue shall be considered by a one-member panel.

EXHIBIT B
16

SER019

7. The IRP Provider shall determine a procedure for assigning members to individual panels; provided that if ICANN so directs, the IRP Provider shall establish a standing panel to hear such claims.

8. The IRP shall have the authority to:

    a. request additional written submissions from the party seeking review, the Board, the Supporting Organizations, or from other parties;

    b. declare whether an action or inaction of the Board was inconsistent with the Articles of Incorporation or Bylaws; and

    c. recommend that the Board stay any action or decision, or that the Board take any interim action, until such time as the Board reviews and acts upon the opinion of the IRP.

9. Individuals holding an official position or office within the ICANN structure are not eligible to serve on the IRP.

10. In order to keep the costs and burdens of independent review as low as possible, the IRP should conduct its proceedings by e-mail and otherwise via the Internet to the maximum extent feasible. Where necessary, the IRP may hold meetings by telephone.

11. The IRP shall adhere to conflicts-of-interest policy stated in the IRP Provider's operating rules and procedures, as approved by the Board.

12. Declarations of the IRP shall be in writing. The IRP shall make its declaration based solely on the documentation, supporting materials, and arguments submitted by the parties, and in its declaration shall specifically designate the prevailing party. The party not prevailing shall ordinarily be responsible for bearing all costs of the IRP Provider, but in an extraordinary case the IRP may in its declaration allocate up to half of the costs of the IRP Provider to the prevailing party based upon the circumstances, including a consideration of the reasonableness of the parties' positions and their contribution to the public interest. Each party to the IRP proceedings shall bear its own expenses.

13. The IRP operating procedures, and all petitions, claims, and declarations, shall be posted on the Website when they become available.

14. The IRP may, in its discretion, grant a party's request to keep certain information confidential, such as trade secrets.

15. Where feasible, the Board shall consider the IRP declaration at the Board's next meeting.

## Section 4. PERIODIC REVIEW OF ICANN STRUCTURE AND OPERATIONS

1. The Board shall cause a periodic review of the performance and operation of each Supporting Organization, each Supporting Organization Council, each Advisory Committee (other than the Governmental Advisory Committee), and the Nominating Committee by an entity or entities independent of the organization under review. The goal of the review, to be undertaken pursuant to such criteria and standards as the Board shall direct, shall be to determine (i) whether that organization has a continuing purpose in the ICANN structure, and (ii) if so, whether any change in structure or operations is desirable to improve its effectiveness.

These periodic reviews shall be conducted no less frequently than every five years, based on feasibility as determined by the Board. Each five-year cycle will be computed from the moment of the reception by the Board of the final report of the relevant review Working Group.

The results of such reviews shall be posted on the Website for public review and comment, and shall be considered by the Board no later than the second scheduled meeting of the Board after such results have been posted for 30 days. The consideration by the Board includes the ability to revise the structure or operation of the parts of ICANN being reviewed by a two-thirds vote of all members of the Board.

EXHIBIT B

17

Case: 13-55553    11/08/2013    ID: 8857379    DktEntry: 15-2    Page: 23 of 74

2. The Governmental Advisory Committee shall provide its own review mechanisms.

# ARTICLE V: OMBUDSMAN

## Section 1. OFFICE OF OMBUDSMAN

1. There shall be an Office of Ombudsman, to be managed by an Ombudsman and to include such staff support as the Board determines is appropriate and feasible. The Ombudsman shall be a full-time position, with salary and benefits appropriate to the function, as determined by the Board.

2. The Ombudsman shall be appointed by the Board for an initial term of two years, subject to renewal by the Board.

3. The Ombudsman shall be subject to dismissal by the Board only upon a three-fourths (3/4) vote of the entire Board.

4. The annual budget for the Office of Ombudsman shall be established by the Board as part of the annual ICANN budget process. The Ombudsman shall submit a proposed budget to the President, and the President shall include that budget submission in its entirety and without change in the general ICANN budget recommended by the ICANN President to the Board. Nothing in this Article shall prevent the President from offering separate views on the substance, size, or other features of the Ombudsman's proposed budget to the Board.

## Section 2. CHARTER

The charter of the Ombudsman shall be to act as a neutral dispute resolution practitioner for those matters for which the provisions of the Reconsideration Policy set forth in Section 2 of Article IV or the Independent Review Policy set forth in Section 3 of Article IV have not been invoked. The principal function of the Ombudsman shall be to provide an independent internal evaluation of complaints by members of the ICANN community who believe that the ICANN staff, Board or an ICANN constituent body has treated them unfairly. The Ombudsman shall serve as an objective advocate for fairness, and shall seek to evaluate and where possible resolve complaints about unfair or inappropriate treatment by ICANN staff, the Board, or ICANN constituent bodies, clarifying the issues and using conflict resolution tools such as negotiation, facilitation, and "shuttle diplomacy" to achieve these results.

## Section 3. OPERATIONS

The Office of Ombudsman shall:

1. facilitate the fair, impartial, and timely resolution of problems and complaints that affected members of the ICANN community (excluding employees and vendors/suppliers of ICANN) may have with specific actions or failures to act by the Board or ICANN staff which have not otherwise become the subject of either the Reconsideration or Independent Review Policies;

2. exercise discretion to accept or decline to act on a complaint or question, including by the development of procedures to dispose of complaints that are insufficiently concrete, substantive, or related to ICANN's interactions with the community so as to be inappropriate subject matters for the Ombudsman to act on. In addition, and without limiting the foregoing, the Ombudsman shall have no authority to act in any way with respect to internal administrative matters, personnel matters, issues relating to membership on the Board, or issues related to vendor/supplier relations;

3. have the right to have access to (but not to publish if otherwise confidential) all necessary information and records from ICANN staff and constituent bodies to enable an informed evaluation of the complaint and to assist in dispute resolution where feasible (subject only to such confidentiality obligations as are imposed by the complainant or any generally applicable confidentiality policies adopted by ICANN);

4. heighten awareness of the Ombudsman program and functions through routine interaction with the ICANN community and online availability;

EXHIBIT B
18

SER021

5. maintain neutrality and independence, and have no bias or personal stake in an outcome; and

6. comply with all ICANN conflicts-of-interest and confidentiality policies.

### Section 4. INTERACTION WITH ICANN AND OUTSIDE ENTITIES

1. No ICANN employee, Board member, or other participant in Supporting Organizations or Advisory Committees shall prevent or impede the Ombudsman's contact with the ICANN community (including employees of ICANN). ICANN employees and Board members shall direct members of the ICANN community who voice problems, concerns, or complaints about ICANN to the Ombudsman, who shall advise complainants about the various options available for review of such problems, concerns, or complaints.

2. ICANN staff and other ICANN participants shall observe and respect determinations made by the Office of Ombudsman concerning confidentiality of any complaints received by that Office.

3. Contact with the Ombudsman shall not constitute notice to ICANN of any particular action or cause of action.

4. The Ombudsman shall be specifically authorized to make such reports to the Board as he or she deems appropriate with respect to any particular matter and its resolution or the inability to resolve it. Absent a determination by the Ombudsman, in his or her sole discretion, that it would be inappropriate, such reports shall be posted on the Website.

5. The Ombudsman shall not take any actions not authorized in these Bylaws, and in particular shall not institute, join, or support in any way any legal actions challenging ICANN structure, procedures, processes, or any conduct by the ICANN Board, staff, or constituent bodies.

### Section 5. ANNUAL REPORT

The Office of Ombudsman shall publish on an annual basis a consolidated analysis of the year's complaints and resolutions, appropriately dealing with confidentiality obligations and concerns. Such annual report should include a description of any trends or common elements of complaints received during the period in question, as well as recommendations for steps that could be taken to minimize future complaints. The annual report shall be posted on the Website.

## ARTICLE VI: BOARD OF DIRECTORS

### Section 1. COMPOSITION OF THE BOARD

The ICANN Board of Directors ("Board") shall consist of sixteen voting members ("Directors"). In addition, five non-voting liaisons ("Liaisons") shall be designated for the purposes set forth in Section 9 of this Article. Only Directors shall be included in determining the existence of quorums, and in establishing the validity of votes taken by the ICANN Board.

### Section 2. DIRECTORS AND THEIR SELECTION; ELECTION OF CHAIRMAN AND VICE-CHAIRMAN

1. The Directors shall consist of:

a. Eight voting members selected by the Nominating Committee established by Article VII of these Bylaws. These seats on the Board of Directors are referred to in these Bylaws as Seats 1 through 8.

b. Two voting members selected by the Address Supporting Organization according to the provisions of Article VIII of these Bylaws. These seats on the Board of Directors are referred to in these Bylaws as Seat 9 and Seat 10.

c. Two voting members selected by the Country-Code Names Supporting Organization according to the provisions of Article IX of these Bylaws. These seats on the Board of Directors are referred to in these Bylaws as Seat 11 and Seat 12.

**EXHIBIT B**
**19**

Case: 13-55553   11/08/2013   ID: 8857379   DktEntry: 15-2   Page: 25 of 74

d. Two voting members selected by the Generic Names Supporting Organization according to the provisions of Article X of these Bylaws. These seats on the Board of Directors are referred to in these Bylaws as Seat 13 and Seat 14.

e. One voting member selected by the At-Large Community according to the provisions of Article XI of these Bylaws.  This seat on the Board of Directors is referred to in these Bylaws as Seat 15.

f. The President ex officio, who shall be a voting member.

2. In carrying out its responsibilities to fill Seats 1 through 8, the Nominating Committee shall seek to ensure that the ICANN Board is composed of members who in the aggregate display diversity in geography, culture, skills, experience, and perspective, by applying the criteria set forth in Section 3 of this Article. At no time when it makes its selection shall the Nominating Committee select a Director to fill any vacancy or expired term whose selection would cause the total number of Directors (not including the President) from countries in any one Geographic Region (as defined in Section 5 of this Article) to exceed five; and the Nominating Committee shall ensure when it makes its selections that the Board includes at least one Director who is from a country in each ICANN Geographic Region ("Diversity Calculation").

For purposes of this sub-section 2 of Article VI, Section 2 of the ICANN Bylaws, if any candidate for director maintains citizenship of more than one country, or has been domiciled for more than five years in a country of which the candidate does not maintain citizenship ("Domicile"), that candidate may be deemed to be from either country and must select in his/her Statement of Interest the country of citizenship or Domicile that he/she wants the Nominating Committee to use for Diversity Calculation purposes. For purposes of this sub-section 2 of Article VI, Section 2 of the ICANN Bylaws, a person can only have one "Domicile," which shall be determined by where the candidate has a permanent residence and place of habitation.

3. In carrying out their responsibilities to fill Seats 9 through 15, the Supporting Organizations and the At-Large Community shall seek to ensure that the ICANN Board is composed of members that in the aggregate display diversity in geography, culture, skills, experience, and perspective, by applying the criteria set forth in Section 3 of this Article. At any given time, no two Directors selected by a Supporting Organization shall be citizens from the same country or of countries located in the same Geographic Region.

For purposes of this sub-section 3 of Article VI, Section 2 of the ICANN Bylaws, if any candidate for director maintains citizenship of more than one country, or has been domiciled for more than five years in a country of which the candidate does not maintain citizenship ("Domicile"), that candidate may be deemed to be from either country and must select in his/her Statement of Interest the country of citizenship or Domicile that he/she wants the Supporting Organization or the At-Large Community to use for selection purposes. For purposes of this sub-section 3 of Article VI, Section 2 of the ICANN Bylaws, a person can only have one "Domicile," which shall be determined by where the candidate has a permanent residence and place of habitation.

4. The Board shall annually elect a Chairman and a Vice-Chairman from among the Directors, not including the President.

## Section 3. CRITERIA FOR SELECTION OF DIRECTORS

ICANN Directors shall be:

1. Accomplished persons of integrity, objectivity, and intelligence, with reputations for sound judgment and open minds, and a demonstrated capacity for thoughtful group decision-making;

2. Persons with an understanding of ICANN's mission and the potential impact of ICANN decisions on the global Internet community, and committed to the success of ICANN;

3. Persons who will produce the broadest cultural and geographic diversity on the Board consistent with meeting the other criteria set forth in this Section;

4. Persons who, in the aggregate, have personal familiarity with the operation of gTLD registries and

registrars; with ccTLD registries; with IP address registries; with Internet technical standards and protocols; with policy-development procedures, legal traditions, and the public interest; and with the broad range of business, individual, academic, and non-commercial users of the Internet;

5. Persons who are willing to serve as volunteers, without compensation other than the reimbursement of certain expenses; and

6. Persons who are able to work and communicate in written and spoken English.

## Section 4. ADDITIONAL QUALIFICATIONS

1. Notwithstanding anything herein to the contrary, no official of a national government or a multinational entity established by treaty or other agreement between national governments may serve as a Director. As used herein, the term "official" means a person (i) who holds an elective governmental office or (ii) who is employed by such government or multinational entity and whose primary function with such government or entity is to develop or influence governmental or public policies.

2. No person who serves in any capacity (including as a liaison) on any Supporting Organization Council shall simultaneously serve as a Director or liaison to the Board. If such a person accepts a nomination to be considered for selection by the Supporting Organization Council or the At-Large Community to be a Director, the person shall not, following such nomination, participate in any discussion of, or vote by, the Supporting Organization Council or the committee designated by the At-Large Community relating to the selection of Directors by the Council or Community, until the Council or committee(s) designated by the At-Large Community has selected the full complement of Directors it is responsible for selecting. In the event that a person serving in any capacity on a Supporting Organization Council accepts a nomination to be considered for selection as a Director, the constituency group or other group or entity that selected the person may select a replacement for purposes of the Council's selection process.  In the event that a person serving in any capacity on the At-Large Advisory Committee accepts a nomination to be considered for selection by the At-Large Community as a Director, the Regional At-Large Organization or other group or entity that selected the person may select a replacement for purposes of the Community's selection process.

3. Persons serving in any capacity on the Nominating Committee shall be ineligible for selection to positions on the Board as provided by Article VII, Section 8.

## Section 5. INTERNATIONAL REPRESENTATION

In order to ensure broad international representation on the Board, the selection of Directors by the Nominating Committee, each Supporting Organization and the At-Large Community shall comply with all applicable diversity provisions of these Bylaws or of any Memorandum of Understanding referred to in these Bylaws concerning the Supporting Organization. One intent of these diversity provisions is to ensure that at all times each Geographic Region shall have at least one Director, and at all times no region shall have more than five Directors on the Board (not including the President). As used in these Bylaws, each of the following is considered to be a "Geographic Region": Europe; Asia/Australia/Pacific; Latin America/Caribbean islands; Africa; and North America. The specific countries included in each Geographic Region shall be determined by the Board, and this Section shall be reviewed by the Board from time to time (but at least every three years) to determine whether any change is appropriate, taking account of the evolution of the Internet.

## Section 6. DIRECTORS' CONFLICTS OF INTEREST

The Board, through the Board Governance Committee, shall require a statement from each Director not less frequently than once a year setting forth all business and other affiliations that relate in any way to the business and other affiliations of ICANN. Each Director shall be responsible for disclosing to ICANN any matter that could reasonably be considered to make such Director an "interested director" within the meaning of Section 5233 of the California Nonprofit Public Benefit Corporation Law ("CNPBCL"). In addition, each Director shall disclose to ICANN any relationship or other factor that could reasonably be considered to cause the Director to be considered to be an "interested person" within the meaning of Section 5227 of the CNPBCL. The Board shall adopt policies specifically addressing Director, Officer, and Supporting Organization conflicts of interest. No Director shall vote on any matter in which he or she has a material and direct financial interest that would be affected by the outcome of the vote.

## Section 7. DUTIES OF DIRECTORS

EXHIBIT B
21

Case: 13-55553    11/08/2013    ID: 8857379    DktEntry: 15-2    Page: 27 of 74

Directors shall serve as individuals who have the duty to act in what they reasonably believe are the best interests of ICANN and not as representatives of the entity that selected them, their employers, or any other organizations or constituencies.

**Section 8. TERMS OF DIRECTORS**

1. The regular term of office of Director Seats 1 through 15 shall begin as follows:

a. The regular terms of Seats 1 through 3 shall begin at the conclusion of ICANN's annual meeting in 2003 and each ICANN annual meeting every third year after 2003;

b. The regular terms of Seats 4 through 6 shall begin at the conclusion of ICANN's annual meeting in 2004 and each ICANN annual meeting every third year after 2004;

c. The regular terms of Seats 7 and 8 shall begin at the conclusion of ICANN's annual meeting in 2005 and each ICANN annual meeting every third year after 2005;

d. The terms of Seats 9 and 12 shall continue until the conclusion of ICANN's Mid-year Meeting after ICANN's annual meeting in 2011. The next terms of Seats 9 and 12 shall begin at the conclusion of the Mid-year Meeting occurring after the 2011 ICANN annual meeting and each ICANN annual meeting every third year after 2011;

e. The terms of Seats 10 and 13 shall continue until the conclusion of ICANN's Mid-year Meeting after the 2012 ICANN annual meeting. The next terms of Seats 10 and 13 shall begin at the conclusion of the Mid-year Meeting occurring after the 2012 ICANN annual meeting and each ICANN annual meeting every third year after 2012; and

f. The terms of Seats 11 and 14 shall begin at the conclusion of ICANN's Mid-year Meeting after the 2010 ICANN annual meeting, and each ICANN annual meeting every third year after 2010.

g. The first regular term of Seat 15 shall begin at the conclusion of ICANN's Mid-year Meeting after the 2010 ICANN annual meeting and each ICANN annual meeting every third year after 2010. (Note: In the period prior to the beginning of the regular term of Seat 15, Seat 15 is deemed vacant. Through a process coordinated by the At Large Advisory Committee, the At-Large Community made the selection of a Director to fill the vacant Seat 15 and provided the ICANN Secretary written notice of its selection. The vacant Seat 15 was filled at the conclusion of the ICANN annual meeting in 2010, with a term to conclude upon the commencement of the first regular term specified for Seat 15 in accordance with this Section of the Bylaws. Until the conclusion of the ICANN annual meeting in 2010, there was a non-voting Liaison appointed by the At Large Advisory Committee who participated as specified at Sections 9(3) and 9(5) of this Article.)

h. For the purposes of this Section, the term "Mid-year Meeting" refers to the first ICANN Public Meeting occurring no sooner than six and no later than eight months after the conclusion of ICANN's annual general meeting. In the event that a Mid-year Meeting is scheduled and subsequently cancelled within six months prior to the date of its commencement, the term of any seat scheduled to begin at the conclusion of the Mid-year Meeting shall begin on the date the Mid-year Meeting was previously scheduled to conclude. In the event that no Public Meeting is scheduled during the time defined for the Mid-year Meeting, the term of any seat set to begin at the conclusion of the Mid-year Meeting shall instead begin on the day six months after the conclusion of ICANN's annual meeting.

2. Each Director holding any of Seats 1 through 15, including a Director selected to fill a vacancy, shall hold office for a term that lasts until the next term for that Seat commences and until a successor has been selected and qualified or until that Director resigns or is removed in accordance with these Bylaws.

3. At least two months before the commencement of each annual meeting, the Nominating Committee shall give the Secretary of ICANN written notice of its selection of Directors for seats with terms beginning at the conclusion of the annual meeting.

4. At least two months before the date specified for the commencement of the term as specified in paragraphs 1.d-g above, any Supporting Organization or the At-Large community entitled to select a Director for a Seat with a term beginning that year shall give the Secretary of ICANN written notice of its selection.

5. Subject to the provisions of the Transition Article of these Bylaws, no Director may serve more than three consecutive terms. For these purposes, a person selected to fill a vacancy in a term shall not be deemed to have served that term. Any prior service in Seats 9, 10, 11, 12, 13 and 14 as such terms were defined in the Bylaws as of [insert date before amendment effective], so long as such service was not to fill a vacancy, shall be included in the calculation of consecutive terms under this paragraph.

6. The term as Director of the person holding the office of President shall be for as long as, and only for as long as, such person holds the office of President.

## Section 9. NON-VOTING LIAISONS

1. The non-voting liaisons shall include:

    a. One appointed by the Governmental Advisory Committee;

    b. One appointed by the Root Server System Advisory Committee established by Article XI of these Bylaws;

    c. One appointed by the Security and Stability Advisory Committee established by Article XI of these Bylaws;

    d. One appointed by the Technical Liaison Group established by Article XI-A of these Bylaws;

    e. One appointed by the Internet Engineering Task Force.

2. Subject to the provisions of the Transition Article of these Bylaws, the non-voting liaisons shall serve terms that begin at the conclusion of each annual meeting. At least one month before the commencement of each annual meeting, each body entitled to appoint a non-voting liaison shall give the Secretary of ICANN written notice of its appointment.

3. Non-voting liaisons shall serve as volunteers, without compensation other than the reimbursement of certain expenses.

4. Each non-voting liaison may be reappointed, and shall remain in that position until a successor has been appointed or until the liaison resigns or is removed in accordance with these Bylaws.

5. The non-voting liaisons shall be entitled to attend Board meetings, participate in Board discussions and deliberations, and have access (under conditions established by the Board) to materials provided to Directors for use in Board discussions, deliberations and meetings, but shall otherwise not have any of the rights and privileges of Directors. Non-voting liaisons shall be entitled (under conditions established by the Board) to use any materials provided to them pursuant to this Section for the purpose of consulting with their respective committee or organization.

## Section 10. RESIGNATION OF A DIRECTOR OR NON-VOTING LIAISON

Subject to Section 5226 of the CNPBCL, any Director or non-voting liaison may resign at any time, either by oral tender of resignation at any meeting of the Board (followed by prompt written notice to the Secretary of ICANN) or by giving written notice thereof to the President or the Secretary of ICANN. Such resignation shall take effect at the time specified, and, unless otherwise specified, the acceptance of such resignation shall not be necessary to make it effective. The successor shall be selected pursuant to Section 12 of this Article.

## Section 11. REMOVAL OF A DIRECTOR OR NON-VOTING LIAISON

SER026

ICANN | Bylaws | 8 December 2011
Case: 13-55553    11/08/2013    ID: 8857379    DktEntry: 15-2    Page: 29 of 74    Page 46 of 57
Case 2:12-cv-08676-PA-PLA    Document 20    Filed 11/30/12    Page 27 of 72    Page ID #:159

1. Any Director may be removed, following notice to that Director, by a three-fourths (3/4) majority vote of all Directors; provided, however, that the Director who is the subject of the removal action shall not be entitled to vote on such an action or be counted as a voting member of the Board when calculating the required three-fourths (3/4) vote; and provided further, that each vote to remove a Director shall be a separate vote on the sole question of the removal of that particular Director. If the Director was selected by a Supporting Organization, notice must be provided to that Supporting Organization at the same time notice is provided to the Director. If the Director was selected by the At-Large Community, notice must be provided to the At-Large Advisory Committee at the same time notice is provided to the Director.

2. With the exception of the non-voting liaison appointed by the Governmental Advisory Committee, any non-voting liaison may be removed, following notice to that liaison and to the organization by which that liaison was selected, by a three-fourths (3/4) majority vote of all Directors if the selecting organization fails to promptly remove that liaison following such notice. The Board may request the Governmental Advisory Committee to consider the replacement of the non-voting liaison appointed by that Committee if the Board, by a three-fourths (3/4) majority vote of all Directors, determines that such an action is appropriate.

## Section 12. VACANCIES

1. A vacancy or vacancies in the Board of Directors shall be deemed to exist in the case of the death, resignation, or removal of any Director; if the authorized number of Directors is increased; or if a Director has been declared of unsound mind by a final order of court or convicted of a felony or incarcerated for more than 90 days as a result of a criminal conviction or has been found by final order or judgment of any court to have breached a duty under Sections 5230 et seq. of the CNPBCL. Any vacancy occurring on the Board of Directors shall be filled by the Nominating Committee, unless (a) that Director was selected by a Supporting Organization, in which case that vacancy shall be filled by that Supporting Organization, or (b) that Director was the President, in which case the vacancy shall be filled in accordance with the provisions of Article XIII of these Bylaws. The selecting body shall give written notice to the Secretary of ICANN of their appointments to fill vacancies. A Director selected to fill a vacancy on the Board shall serve for the unexpired term of his or her predecessor in office and until a successor has been selected and qualified. No reduction of the authorized number of Directors shall have the effect of removing a Director prior to the expiration of the Director's term of office.

2. The organizations selecting the non-voting liaisons identified in Section 9 of this Article are responsible for determining the existence of, and filling, any vacancies in those positions. They shall give the Secretary of ICANN written notice of their appointments to fill vacancies.

## Section 13. ANNUAL MEETINGS

Annual meetings of ICANN shall be held for the purpose of electing Officers and for the transaction of such other business as may come before the meeting. Each annual meeting for ICANN shall be held at the principal office of ICANN, or any other appropriate place of the Board's time and choosing, provided such annual meeting is held within 14 months of the immediately preceding annual meeting. If the Board determines that it is practical, the annual meeting should be distributed in real-time and archived video and audio formats on the Internet.

## Section 14. REGULAR MEETINGS

Regular meetings of the Board shall be held on dates to be determined by the Board. In the absence of other designation, regular meetings shall be held at the principal office of ICANN.

## Section 15. SPECIAL MEETINGS

Special meetings of the Board may be called by or at the request of one-quarter (1/4) of the members of the Board or by the Chairman of the Board or the President. A call for a special meeting shall be made by the Secretary of ICANN. In the absence of designation, special meetings shall be held at the principal office of ICANN.

## Section 16. NOTICE OF MEETINGS

Notice of time and place of all meetings shall be delivered personally or by telephone or by electronic mail to each Director and non-voting liaison, or sent by first-class mail (air mail for addresses outside the United States) or facsimile, charges prepaid, addressed to each Director and non-voting liaison at the Director's or non-voting liaison's address as it is

shown on the records of ICANN. In case the notice is mailed, it shall be deposited in the United States mail at least fourteen (14) days before the time of the holding of the meeting. In case the notice is delivered personally or by telephone or facsimile or electronic mail it shall be delivered personally or by telephone or facsimile or electronic mail at least forty-eight (48) hours before the time of the holding of the meeting. Notwithstanding anything in this Section to the contrary, notice of a meeting need not be given to any Director who signed a waiver of notice or a written consent to holding the meeting or an approval of the minutes thereof, whether before or after the meeting, or who attends the meeting without protesting, prior thereto or at its commencement, the lack of notice to such Director. All such waivers, consents and approvals shall be filed with the corporate records or made a part of the minutes of the meetings.

## Section 17. QUORUM

At all annual, regular, and special meetings of the Board, a majority of the total number of Directors then in office shall constitute a quorum for the transaction of business, and the act of a majority of the Directors present at any meeting at which there is a quorum shall be the act of the Board, unless otherwise provided herein or by law. If a quorum shall not be present at any meeting of the Board, the Directors present thereat may adjourn the meeting from time to time to another place, time, or date. If the meeting is adjourned for more than twenty-four (24) hours, notice shall be given to those Directors not at the meeting at the time of the adjournment.

## Section 18. ACTION BY TELEPHONE MEETING OR BY OTHER COMMUNICATIONS EQUIPMENT

Members of the Board or any Committee of the Board may participate in a meeting of the Board or Committee of the Board through use of (i) conference telephone or similar communications equipment, provided that all Directors participating in such a meeting can speak to and hear one another or (ii) electronic video screen communication or other communication equipment; provided that (a) all Directors participating in such a meeting can speak to and hear one another, (b) all Directors are provided the means of fully participating in all matters before the Board or Committee of the Board, and (c) ICANN adopts and implements means of verifying that (x) a person participating in such a meeting is a Director or other person entitled to participate in the meeting and (y) all actions of, or votes by, the Board or Committee of the Board are taken or cast only by the members of the Board or Committee and not persons who are not members. Participation in a meeting pursuant to this Section constitutes presence in person at such meeting. ICANN shall make available at the place of any meeting of the Board the telecommunications equipment necessary to permit members of the Board to participate by telephone.

## Section 19. ACTION WITHOUT MEETING

Any action required or permitted to be taken by the Board or a Committee of the Board may be taken without a meeting if all of the Directors entitled to vote thereat shall individually or collectively consent in writing to such action. Such written consent shall have the same force and effect as the unanimous vote of such Directors. Such written consent or consents shall be filed with the minutes of the proceedings of the Board.

## Section 20. ELECTRONIC MAIL

If permitted under applicable law, communication by electronic mail shall be considered equivalent to any communication otherwise required to be in writing. ICANN shall take such steps as it deems appropriate under the circumstances to assure itself that communications by electronic mail are authentic.

## Section 21. RIGHTS OF INSPECTION

Every Director shall have the right at any reasonable time to inspect and copy all books, records and documents of every kind, and to inspect the physical properties of ICANN. ICANN shall establish reasonable procedures to protect against the inappropriate disclosure of confidential information.

## Section 22. COMPENSATION

1. Except for the President of ICANN, who serves ex officio as a voting member of the Board, each of the Directors shall be entitled to receive compensation for his/her services as a Director. The President shall receive only his/her compensation for service as President and shall not receive additional compensation for service as a Director.

2. If the Board determines to offer a compensation arrangement to one or more Directors other than the

EXHIBIT B
25

Case: 13-55553   11/08/2013      ID: 8857379    DktEntry: 15-2    Page: 31 of 74  Page 48 of 57

Case 2:12-cv-08676-PA-PLA   Document 20   Filed 11/30/12   Page 29 of 72   Page ID #:161

President of ICANN for services to ICANN as Directors, the Board shall follow a process that is calculated to pay an amount for service as a Director that is in its entirety Reasonable Compensation for such service under the standards set forth in §53.4958-4(b) of the Treasury Regulations.

3. As part of the process, the Board shall retain an Independent Valuation Expert to consult with and to advise the Board regarding Director compensation arrangements and to issue to the Board a Reasoned Written Opinion from such expert regarding the ranges of Reasonable Compensation for any such services by a Director. The expert's opinion shall address all relevant factors affecting the level of compensation to be paid a Director, including offices held on the Board, attendance at Board and Committee meetings, the nature of service on the Board and on Board Committees, and appropriate data as to comparability regarding director compensation arrangements for U.S.-based, nonprofit, tax-exempt organizations possessing a global employee base.

4. After having reviewed the expert's written opinion, the Board shall meet with the expert to discuss the expert's opinion and to ask questions of the expert regarding the expert's opinion, the comparability data obtained and relied upon, and the conclusions reached by the expert.

5. The Board shall adequately document the basis for any determination the Board makes regarding a Director compensation arrangement concurrently with making that determination.

6. In addition to authorizing payment of compensation for services as Directors as set forth in this Section 22, the Board may also authorize the reimbursement of actual and necessary reasonable expenses incurred by any Director and by non-voting liaisons performing their duties as Directors or non-voting liaisons.

7. As used in this Section 22, the following terms shall have the following meanings:

(a) An "Independent Valuation Expert" means a person retained by ICANN to value compensation arrangements that: (i) holds itself out to the public as a compensation consultant; (ii) performs valuations regarding compensation arrangements on a regular basis, with a majority of its compensation consulting services performed for persons other than ICANN; (iii) is qualified to make valuations of the type of services involved in any engagement by and for ICANN; (iv) issues to ICANN a Reasoned Written Opinion regarding a particular compensation arrangement; and (v) includes in its Reasoned Written Opinion a certification that it meets the requirements set forth in (i) through (iv) of this definition.

(b) A "Reasoned Written Opinion" means a written opinion of a valuation expert who meets the requirements of subparagraph 7(a) (i) through (iv) of this Section. To be reasoned, the opinion must be based upon a full disclosure by ICANN to the valuation expert of the factual situation regarding the compensation arrangement that is the subject of the opinion, the opinion must articulate the applicable valuation standards relevant in valuing such compensation arrangement, and the opinion must apply those standards to such compensation arrangement, and the opinion must arrive at a conclusion regarding the whether the compensation arrangement is within the range of Reasonable Compensation for the services covered by the arrangement. A written opinion is reasoned even though it reaches a conclusion that is subsequently determined to be incorrect so long as the opinion addresses itself to the facts and the applicable standards. However, a written opinion is not reasoned if it does nothing more than recite the facts and express a conclusion.

(c) "Reasonable Compensation" shall have the meaning set forth in §53.4958-4(b)(1)(ii) of the Regulations issued under §4958 of the Code.

## Section 23. PRESUMPTION OF ASSENT

A Director present at a Board meeting at which action on any corporate matter is taken shall be presumed to have assented to the action taken unless his or her dissent or abstention is entered in the minutes of the meeting, or unless such Director files a written dissent or abstention to such action with the person acting as the secretary of the meeting before the adjournment thereof, or forwards such dissent or abstention by registered mail to the Secretary of ICANN immediately after the adjournment of the meeting. Such right to dissent or abstain shall not apply to a Director who voted in favor of such action.

EXHIBIT B
26

SER029

Case 2:12-cv-08676-PA-PLA   Document 20   Filed 11/30/12   Page 30 of 72   Page ID #:162

# ARTICLE VII: NOMINATING COMMITTEE

## Section 1. DESCRIPTION

There shall be a Nominating Committee of ICANN, responsible for the selection of all ICANN Directors except the President and those Directors selected by ICANN's Supporting Organizations, and for such other selections as are set forth in these Bylaws.

## Section 2. COMPOSITION

The Nominating Committee shall be composed of the following persons:

1. A non-voting Chair, appointed by the ICANN Board;

2. A non-voting Chair-Elect, appointed by the ICANN Board as a non-voting advisor;

3. A non-voting liaison appointed by the ICANN Root Server System Advisory Committee established by Article XI of these Bylaws;

4. A non-voting liaison appointed by the ICANN Security and Stability Advisory Committee established by Article XI of these Bylaws;

5. A non-voting liaison appointed by the Governmental Advisory Committee;

6. Subject to the provisions of the Transition Article of these Bylaws, five voting delegates selected by the At-Large Advisory Committee established by Article XI of these Bylaws;

7. Voting delegates to the Nominating Committee shall be selected from the Generic Names Supporting Organization, established by Article X of these Bylaws, as follows:

   a. One delegate from the Registries Stakeholder Group;

   b. One delegate from the Registrars Stakeholder Group;

   c. Two delegates from the Business Constituency, one representing small business users and one representing large business users;

   d. One delegate from the Internet Service Providers Constituency;

   e. One delegate from the Intellectual Property Constituency; and

   f. One delegate from consumer and civil society groups, selected by the Non-Commercial Users Constituency.

8. One voting delegate each selected by the following entities:

   a. The Council of the Country Code Names Supporting Organization established by Article IX of these Bylaws;

   b. The Council of the Address Supporting Organization established by Article VIII of these Bylaws;

   c. The Internet Engineering Task Force; and

   d. The ICANN Technical Liaison Group established by Article XI-A of these Bylaws;

EXHIBIT B

27

Case: 13-55553    11/08/2013    ID: 8857379    DktEntry: 15-2    Page: 33 of 74

Page 20 of 57

Case 2:12-cv-08676-PA-PLA    Document 20    Filed 11/30/12    Page 31 of 72    Page ID #:163

9. A non-voting Associate Chair, who may be appointed by the Chair, at his or her sole discretion, to serve during all or part of the term of the Chair. The Associate Chair may not be a person who is otherwise a member of the same Nominating Committee. The Associate Chair shall assist the Chair in carrying out the duties of the Chair, but shall not serve, temporarily or otherwise, in the place of the Chair.

**Section 3. TERMS**

Subject to the provisions of the Transition Article of these Bylaws:

1. Each voting delegate shall serve a one-year term. A delegate may serve at most two successive one-year terms, after which at least two years must elapse before the individual is eligible to serve another term.

2. The regular term of each voting delegate shall begin at the conclusion of an ICANN annual meeting and shall end at the conclusion of the immediately following ICANN annual meeting.

3. Non-voting liaisons shall serve during the term designated by the entity that appoints them. The Chair, the Chair-Elect, and any Associate Chair shall serve as such until the conclusion of the next ICANN annual meeting.

4. It is anticipated that upon the conclusion of the term of the Chair-Elect, the Chair-Elect will be appointed by the Board to the position of Chair. However, the Board retains the discretion to appoint any other person to the position of Chair. At the time of appointing a Chair-Elect, if the Board determines that the person identified to serve as Chair shall be appointed as Chair for a successive term, the Chair-Elect position shall remain vacant for the term designated by the Board.

5. Vacancies in the positions of delegate, non-voting liaison, Chair or Chair-Elect shall be filled by the entity entitled to select the delegate, non-voting liaison, Chair or Chair-Elect involved. For any term that the Chair-Elect position is vacant pursuant to paragraph 4 of this Article, or until any other vacancy in the position of Chair-Elect can be filled, a non-voting advisor to the Chair may be appointed by the Board from among persons with prior service on the Board or a Nominating Committee, including the immediately previous Chair of the Nominating Committee. A vacancy in the position of Associate Chair may be filled by the Chair in accordance with the criteria established by Section 2(9) of this Article.

6. The existence of any vacancies shall not affect the obligation of the Nominating Committee to carry out the responsibilities assigned to it in these Bylaws.

**Section 4. CRITERIA FOR SELECTION OF NOMINATING COMMITTEE DELEGATES**

Delegates to the ICANN Nominating Committee shall be:

1. Accomplished persons of integrity, objectivity, and intelligence, with reputations for sound judgment and open minds, and with experience and competence with collegial large group decision-making;

2. Persons with wide contacts, broad experience in the Internet community, and a commitment to the success of ICANN;

3. Persons whom the selecting body is confident will consult widely and accept input in carrying out their responsibilities;

4. Persons who are neutral and objective, without any fixed personal commitments to particular individuals, organizations, or commercial objectives in carrying out their Nominating Committee responsibilities;

5. Persons with an understanding of ICANN's mission and the potential impact of ICANN's activities on the broader Internet community who are willing to serve as volunteers, without compensation other than the reimbursement of certain expenses; and

6. Persons who are able to work and communicate in written and spoken English.

EXHIBIT B
28

SER030

## Section 5. DIVERSITY

In carrying out its responsibilities to select members of the ICANN Board (and selections to any other ICANN bodies as the Nominating Committee is responsible for under these Bylaws), the Nominating Committee shall take into account the continuing membership of the ICANN Board (and such other bodies), and seek to ensure that the persons selected to fill vacancies on the ICANN Board (and each such other body) shall, to the extent feasible and consistent with the other criteria required to be applied by Section 4 of this Article, make selections guided by Core Value 4 in Article I, Section 2 .

## Section 6. ADMINISTRATIVE AND OPERATIONAL SUPPORT

ICANN shall provide administrative and operational support necessary for the Nominating Committee to carry out its responsibilities.

## Section 7. PROCEDURES

The Nominating Committee shall adopt such operating procedures as it deems necessary, which shall be published on the Website.

## Section 8. INELIGIBILITY FOR SELECTION BY NOMINATING COMMITTEE

No person who serves on the Nominating Committee in any capacity shall be eligible for selection by any means to any position on the Board or any other ICANN body having one or more membership positions that the Nominating Committee is responsible for filling, until the conclusion of an ICANN annual meeting that coincides with, or is after, the conclusion of that person's service on the Nominating Committee.

## Section 9. INELIGIBILITY FOR SERVICE ON NOMINATING COMMITTEE

No person who is an employee of or paid consultant to ICANN (including the Ombudsman) shall simultaneously serve in any of the Nominating Committee positions described in Section 2 of this Article.

# ARTICLE VIII: ADDRESS SUPPORTING ORGANIZATION

## Section 1. DESCRIPTION

1. The Address Supporting Organization (ASO) shall advise the Board with respect to policy issues relating to the operation, assignment, and management of Internet addresses.

2. The ASO shall be the entity established by the Memorandum of Understanding entered on 21 October 2004 between ICANN and the Number Resource Organization (NRO), an organization of the existing regional Internet registries (RIRs).

## Section 2. ADDRESS COUNCIL

1. The ASO shall have an Address Council, consisting of the members of the NRO Number Council.

2. The Address Council shall select Directors to those seats on the Board designated to be filled by the ASO.

# ARTICLE IX: COUNTRY-CODE NAMES SUPPORTING ORGANIZATION

## Section 1. DESCRIPTION

There shall be a policy-development body known as the Country-Code Names Supporting Organization (ccNSO), which shall be responsible for:

1. developing and recommending to the Board global policies relating to country-code top-level domains;

EXHIBIT B
29

SER052

Case: 13-55553    11/08/2013    ID: 8857379    DktEntry: 15-2    Page: 35 of 74

2. Nurturing consensus across the ccNSO's community, including the name-related activities of ccTLDs; and

3. Coordinating with other ICANN Supporting Organizations, committees, and constituencies under ICANN.

Policies that apply to ccNSO members by virtue of their membership are only those policies developed according to section 4.10 and 4.11 of this Article. However, the ccNSO may also engage in other activities authorized by its members. Adherence to the results of these activities will be voluntary and such activities may include: seeking to develop voluntary best practices for ccTLD managers, assisting in skills building within the global community of ccTLD managers, and enhancing operational and technical cooperation among ccTLD managers.

## Section 2. ORGANIZATION

The ccNSO shall consist of (i) ccTLD managers that have agreed in writing to be members of the ccNSO (see Section 4 (2) of this Article) and (ii) a ccNSO Council responsible for managing the policy-development process of the ccNSO.

## Section 3. ccNSO COUNCIL

1. The ccNSO Council shall consist of (a) three ccNSO Council members selected by the ccNSO members within each of ICANN's Geographic Regions in the manner described in Section 4(7) through (9) of this Article; (b) three ccNSO Council members selected by the ICANN Nominating Committee; (c) liaisons as described in paragraph 2 of this Section; and (iv) observers as described in paragraph 3 of this Section.

2. There shall also be one liaison to the ccNSO Council from each of the following organizations, to the extent they choose to appoint such a liaison: (a) the Governmental Advisory Committee; (b) the At-Large Advisory Committee; and (c) each of the Regional Organizations described in Section 5 of this Article. These liaisons shall not be members of or entitled to vote on the ccNSO Council, but otherwise shall be entitled to participate on equal footing with members of the ccNSO Council. Appointments of liaisons shall be made by providing written notice to the ICANN Secretary, with a notification copy to the ccNSO Council Chair, and shall be for the term designated by the appointing organization as stated in the written notice. The appointing organization may recall from office or replace its liaison at any time by providing written notice of the recall or replacement to the ICANN Secretary, with a notification copy to the ccNSO Council Chair.

3. The ccNSO Council may agree with the Council of any other ICANN Supporting Organization to exchange observers. Such observers shall not be members of or entitled to vote on the ccNSO Council, but otherwise shall be entitled to participate on equal footing with members of the ccNSO Council. The appointing Council may designate its observer (or revoke or change the designation of its observer) on the ccNSO Council at any time by providing written notice to the ICANN Secretary, with a notification copy to the ccNSO Council Chair.

4. Subject to the provisions of the Transition Article of these Bylaws: (a) the regular term of each ccNSO Council member shall begin at the conclusion of an ICANN annual meeting and shall end at the conclusion of the third ICANN annual meeting thereafter; (b) the regular terms of the three ccNSO Council members selected by the ccNSO members within each ICANN Geographic Region shall be staggered so that one member's term begins in a year divisible by three, a second member's term begins in the first year following a year divisible by three, and the third member's term begins in the second year following a year divisible by three; and (c) the regular terms of the three ccNSO Council members selected by the Nominating Committee shall be staggered in the same manner. Each ccNSO Council member shall hold office during his or her regular term and until a successor has been selected and qualified or until that member resigns or is removed in accordance with these Bylaws.

5. A ccNSO Council member may resign at any time by giving written notice to the ICANN Secretary, with a notification copy to the ccNSO Council Chair.

6. ccNSO Council members may be removed for not attending three consecutive meetings of the ccNSO Council without sufficient cause or for grossly inappropriate behavior, both as determined by at least a 66% vote of all of the members of the ccNSO Council.

7. A vacancy on the ccNSO Council shall be deemed to exist in the case of the death, resignation, or removal of any ccNSO Council member. Vacancies in the positions of the three members selected by the Nominating Committee shall be filled for the unexpired term involved by the Nominating Committee giving

**EXHIBIT B**

the ICANN Secretary written notice of its selection, with a notification copy to the ccNSO Council Chair. Vacancies in the positions of the ccNSO Council members selected by ccNSO members shall be filled for the unexpired term by the procedure described in Section 4(7) through (9) of this Article.

8. The role of the ccNSO Council is to administer and coordinate the affairs of the ccNSO (including coordinating meetings, including an annual meeting, of ccNSO members as described in Section 4(6) of this Article) and to manage the development of policy recommendations in accordance with Section 6 of this Article. The ccNSO Council shall also undertake such other roles as the members of the ccNSO shall decide from time to time.

9. The ccNSO Council shall make selections to fill Seats 11 and 12 on the Board by written ballot or by action at a meeting; any such selection must have affirmative votes of a majority of all the members of the ccNSO Council then in office. Notification of the ccNSO Council's selections shall be given by the ccNSO Council Chair in writing to the ICANN Secretary, consistent with Article VI, Sections 8(4) and 12(1).

10. The ccNSO Council shall select from among its members the ccNSO Council Chair and such Vice Chair (s) as it deems appropriate. Selections of the ccNSO Council Chair and Vice Chair(s) shall be by written ballot or by action at a meeting; any such selection must have affirmative votes of a majority of all the members of the ccNSO Council then in office. The term of office of the ccNSO Council Chair and any Vice Chair(s) shall be as specified by the ccNSO Council at or before the time the selection is made. The ccNSO Council Chair or any Vice Chair(s) may be recalled from office by the same procedure as used for selection.

11. The ccNSO Council, subject to direction by the ccNSO members, shall adopt such rules and procedures for the ccNSO as it deems necessary, provided they are consistent with these Bylaws. Rules for ccNSO membership and operating procedures adopted by the ccNSO Council shall be published on the Website.

12. Except as provided by paragraphs 9 and 10 of this Section, the ccNSO Council shall act at meetings. The ccNSO Council shall meet regularly on a schedule it determines, but not fewer than four times each calendar year. At the discretion of the ccNSO Council, meetings may be held in person or by other means, provided that all ccNSO Council members are permitted to participate by at least one means described in paragraph 14 of this Section. Except where determined by a majority vote of the members of the ccNSO Council present that a closed session is appropriate, physical meetings shall be open to attendance by all interested persons. To the extent practicable, ccNSO Council meetings should be held in conjunction with meetings of the Board, or of one or more of ICANN's other Supporting Organizations.

13. Notice of time and place (and information about means of participation other than personal attendance) of all meetings of the ccNSO Council shall be provided to each ccNSO Council member, liaison, and observer by e-mail, telephone, facsimile, or a paper notice delivered personally or by postal mail. In case the notice is sent by postal mail, it shall be sent at least 21 days before the day of the meeting. In case the notice is delivered personally or by telephone, facsimile, or e-mail it shall be provided at least seven days before the day of the meeting. At least seven days in advance of each ccNSO Council meeting (or if not practicable, as far in advance as is practicable), a notice of such meeting and, to the extent known, an agenda for the meeting shall be posted.

14. Members of the ccNSO Council may participate in a meeting of the ccNSO Council through personal attendance or use of electronic communication (such as telephone or video conference), provided that (a) all ccNSO Council members participating in the meeting can speak to and hear one another, (b) all ccNSO Council members participating in the meeting are provided the means of fully participating in all matters before the ccNSO Council, and (c) there is a reasonable means of verifying the identity of ccNSO Council members participating in the meeting and their votes. A majority of the ccNSO Council members (i.e. those entitled to vote) then in office shall constitute a quorum for the transaction of business, and actions by a majority vote of the ccNSO Council members present at any meeting at which there is a quorum shall be actions of the ccNSO Council, unless otherwise provided in these Bylaws. The ccNSO Council shall transmit minutes of its meetings to the ICANN Secretary, who shall cause those minutes to be posted to the Website as soon as practicable following the meeting, and no later than 21 days following the meeting.

## Section 4. MEMBERSHIP

1. The ccNSO shall have a membership consisting of ccTLD managers. Any ccTLD manager that meets the membership qualifications stated in paragraph 2 of this Section shall be entitled to be members of the ccNSO. For purposes of this Article, a ccTLD manager is the organization or entity responsible for managing

EXHIBIT B

31

Case: 13-55553    11/08/2013    ID: 8857379    DktEntry: 15-2    Page: 37 of 74

Case 2:12-cv-08676-PA-PLA    Document 20    Filed 11/30/12    Page 35 of 72    Page ID #:167

an ISO 3166 country-code top-level domain and referred to in the IANA database under the current heading of "Sponsoring Organization", or under any later variant, for that country-code top-level domain.

2. Any ccTLD manager may become a ccNSO member by submitting an application to a person designated by the ccNSO Council to receive applications. Subject to the provisions of the Transition Article of these Bylaws, the application shall be in writing in a form designated by the ccNSO Council. The application shall include the ccTLD manager's recognition of the role of the ccNSO within the ICANN structure as well as the ccTLD manager's agreement, for the duration of its membership in the ccNSO, (a) to adhere to rules of the ccNSO, including membership rules, (b) to abide by policies developed and recommended by the ccNSO and adopted by the Board in the manner described by paragraphs 10 and 11 of this Section, and (c) to pay ccNSO membership fees established by the ccNSO Council under Section 7(3) of this Article. A ccNSO member may resign from membership at any time by giving written notice to a person designated by the ccNSO Council to receive notices of resignation. Upon resignation the ccTLD manager ceases to agree to (a) adhere to rules of the ccNSO, including membership rules, (b) to abide by policies developed and recommended by the ccNSO and adopted by the Board in the manner described by paragraphs 10 and 11 of this Section, and (c) to pay ccNSO membership fees established by the ccNSO Council under Section 7 (3) of this Article. In the absence of designation by the ccNSO Council of a person to receive applications and notices of resignation, they shall be sent to the ICANN Secretary, who shall notify the ccNSO Council of receipt of any such applications and notices.

3. Neither membership in the ccNSO nor membership in any Regional Organization described in Section 5 of this Article shall be a condition for access to or registration in the IANA database. Any individual relationship a ccTLD manager has with ICANN or the ccTLD manager's receipt of IANA services is not in any way contingent upon membership in the ccNSO.

4. The Geographic Regions of ccTLDs shall be as described in Article VI, Section 5 of these Bylaws. For purposes of this Article, managers of ccTLDs within a Geographic Region that are members of the ccNSO are referred to as ccNSO members "within" the Geographic Region, regardless of the physical location of the ccTLD manager. In cases where the Geographic Region of a ccNSO member is unclear, the ccTLD member should self-select according to procedures adopted by the ccNSO Council.

5. Each ccTLD manager may designate in writing a person, organization, or entity to represent the ccTLD manager. In the absence of such a designation, the ccTLD manager shall be represented by the person, organization, or entity listed as the administrative contact in the IANA database.

6. There shall be an annual meeting of ccNSO members, which shall be coordinated by the ccNSO Council. Annual meetings should be open for all to attend, and a reasonable opportunity shall be provided for ccTLD managers that are not members of the ccNSO as well as other non-members of the ccNSO to address the meeting. To the extent practicable, annual meetings of the ccNSO members shall be held in person and should be held in conjunction with meetings of the Board, or of one or more of ICANN's other Supporting Organizations.

7. The ccNSO Council members selected by the ccNSO members from each Geographic Region (see Section 3(1)(a) of this Article) shall be selected through nomination, and if necessary election, by the ccNSO members within that Geographic Region. At least 90 days before the end of the regular term of any ccNSO-member-selected member of the ccNSO Council, or upon the occurrence of a vacancy in the seat of such a ccNSO Council member, the ccNSO Council shall establish a nomination and election schedule, which shall be sent to all ccNSO members within the Geographic Region and posted on the Website.

8. Any ccNSO member may nominate an individual to serve as a ccNSO Council member representing the ccNSO member's Geographic Region. Nominations must be seconded by another ccNSO member from the same Geographic Region. By accepting their nomination, individuals nominated to the ccNSO Council agree to support the policies committed to by ccNSO members.

9. If at the close of nominations there are no more candidates nominated (with seconds and acceptances) in a particular Geographic Region than there are seats on the ccNSO Council available for that Geographic Region, then the nominated candidates shall be selected to serve on the ccNSO Council. Otherwise, an election by written ballot (which may be e-mail) shall be held to select the ccNSO Council members from among those nominated (with seconds and acceptances), with ccNSO members from the Geographic Region being entitled to vote in the election through their designated representatives. In such an election, a majority of all ccNSO members in the Geographic Region entitled to vote shall constitute a quorum, and the

selected candidate must receive the votes of a majority of those cast by ccNSO members within the Geographic Region. The ccNSO Council Chair shall provide the ICANN Secretary prompt written notice of the selection of ccNSO Council members under this paragraph.

10. Subject to clause 4(11), ICANN policies shall apply to ccNSO members by virtue of their membership to the extent, and only to the extent, that the policies (a) only address issues that are within scope of the ccNSO according to Article IX, Section 6 and Annex C; (b) have been developed through the ccPDP as described in Section 6 of this Article, and (c) have been recommended as such by the ccNSO to the Board, and (d) are adopted by the Board as policies, provided that such policies do not conflict with the law applicable to the ccTLD manager which shall, at all times, remain paramount. In addition, such policies shall apply to ICANN in its activities concerning ccTLDs.

11. A ccNSO member shall not be bound if it provides a declaration to the ccNSO Council stating that (a) implementation of the policy would require the member to breach custom, religion, or public policy (not embodied in the applicable law described in paragraph 10 of this Section), and (b) failure to implement the policy would not impair DNS operations or interoperability, giving detailed reasons supporting its statements. After investigation, the ccNSO Council will provide a response to the ccNSO member's declaration. If there is a ccNSO Council consensus disagreeing with the declaration, which may be demonstrated by a vote of 14 or more members of the ccNSO Council, the response shall state the ccNSO Council's disagreement with the declaration and the reasons for disagreement. Otherwise, the response shall state the ccNSO Council's agreement with the declaration. If the ccNSO Council disagrees, the ccNSO Council shall review the situation after a six-month period. At the end of that period, the ccNSO Council shall make findings as to (a) whether the ccNSO members' implementation of the policy would require the member to breach custom, religion, or public policy (not embodied in the applicable law described in paragraph 10 of this Section) and (b) whether failure to implement the policy would impair DNS operations or interoperability. In making any findings disagreeing with the declaration, the ccNSO Council shall proceed by consensus, which may be demonstrated by a vote of 14 or more members of the ccNSO Council.

## Section 5. REGIONAL ORGANIZATIONS

The ccNSO Council may designate a Regional Organization for each ICANN Geographic Region, provided that the Regional Organization is open to full membership by all ccNSO members within the Geographic Region. Decisions to designate or de-designate a Regional Organization shall require a 66% vote of all of the members of the ccNSO Council and shall be subject to review according to procedures established by the Board.

## Section 6. ccNSO POLICY-DEVELOPMENT PROCESS AND SCOPE

1. The scope of the ccNSO's policy-development role shall be as stated in Annex C to these Bylaws; any modifications to the scope shall be recommended to the Board by the ccNSO by use of the procedures of the ccPDP, and shall be subject to approval by the Board.

2. In developing global policies within the scope of the ccNSO and recommending them to the Board, the ccNSO shall follow the ccNSO Policy-Development Process (ccPDP). The ccPDP shall be as stated in Annex B to these Bylaws; modifications shall be recommended to the Board by the ccNSO by use of the procedures of the ccPDP, and shall be subject to approval by the Board.

## Section 7. STAFF SUPPORT AND FUNDING

1. Upon request of the ccNSO Council, a member of the ICANN staff may be assigned to support the ccNSO and shall be designated as the ccNSO Staff Manager. Alternatively, the ccNSO Council may designate, at ccNSO expense, another person to serve as ccNSO Staff Manager. The work of the ccNSO Staff Manager on substantive matters shall be assigned by the Chair of the ccNSO Council, and may include the duties of ccPDP Issue Manager.

2. Upon request of the ccNSO Council, ICANN shall provide administrative and operational support necessary for the ccNSO to carry out its responsibilities. Such support shall not include an obligation for ICANN to fund travel expenses incurred by ccNSO participants for travel to any meeting of the ccNSO or for any other purpose. The ccNSO Council may make provision, at ccNSO expense, for administrative and operational support in addition or as an alternative to support provided by ICANN.

EXHIBIT B
33

SER056

Case: 13-55553    11/08/2013    ID: 8857379    DktEntry: 15-2    Page: 39 of 74

3. The ccNSO Council shall establish fees to be paid by ccNSO members to defray ccNSO expenses as described in paragraphs 1 and 2 of this Section, as approved by the ccNSO members.

4. Written notices given to the ICANN Secretary under this Article shall be permanently retained, and shall be made available for review by the ccNSO Council on request. The ICANN Secretary shall also maintain the roll of members of the ccNSO, which shall include the name of each ccTLD manager's designated representative, and which shall be posted on the Website.

# ARTICLE X: GENERIC NAMES SUPPORTING ORGANIZATION

### Section 1. DESCRIPTION

There shall be a policy-development body known as the Generic Names Supporting Organization (GNSO), which shall be responsible for developing and recommending to the ICANN Board substantive policies relating to generic top-level domains.

### Section 2. ORGANIZATION

The GNSO shall consist of:

(i) A number of Constituencies, where applicable, organized within the Stakeholder Groups as described in Section 5 of this Article;

(ii) Four Stakeholder Groups organized within Houses as described in Section 5 of this Article;

(iii) Two Houses within the GNSO Council as described in Section 3(8) of this Article; and

(iv) a GNSO Council responsible for managing the policy development process of the GNSO, as described in Section 3 of this Article.

Except as otherwise defined in these Bylaws, the four Stakeholder Groups and the Constituencies will be responsible for defining their own charters with the approval of their members and of the ICANN Board of Directors.

### Section 3. GNSO COUNCIL

1. Subject to the provisions of Transition Article XX, Section 5 of these Bylaws and as described in Section 5 of Article X, the GNSO Council shall consist of:

a. three representatives selected from the Registries Stakeholder Group;

b. three representatives selected from the Registrars Stakeholder Group;

c. six representatives selected from the Commercial Stakeholder Group;

d. six representatives selected from the Non-Commercial Stakeholder Group; and

e. three representatives selected by the ICANN Nominating Committee, one of which shall be non-voting, but otherwise entitled to participate on equal footing with other members of the GNSO Council including, e.g. the making and seconding of motions and of serving as Chair if elected. One Nominating Committee Appointee voting representative shall be assigned to each House (as described in Section 3(8) of this Article) by the Nominating Committee.

No individual representative may hold more than one seat on the GNSO Council at the same time.

Stakeholder Groups should, in their charters, ensure their representation on the GNSO Council is as diverse as possible and practicable, including considerations of geography, GNSO Constituency, sector, ability and gender.

EXHIBIT B
34

SER037

There may also be liaisons to the GNSO Council from other ICANN Supporting Organizations and/or Advisory Committees, from time to time. The appointing organization shall designate, revoke, or change its liaison on the GNSO Council by providing written notice to the Chair of the GNSO Council and to the ICANN Secretary. Liaisons shall not be members of or entitled to vote, to make or second motions, or to serve as an officer on the GNSO Council, but otherwise liaisons shall be entitled to participate on equal footing with members of the GNSO Council.

2. Subject to the provisions of the Transition Article XX, and Section 5 of these Bylaws, the regular term of each GNSO Council member shall begin at the conclusion of an ICANN annual meeting and shall end at the conclusion of the second ICANN annual meeting thereafter. The regular term of two representatives selected from Stakeholder Groups with three Council seats shall begin in even-numbered years and the regular term of the other representative selected from that Stakeholder Group shall begin in odd-numbered years. The regular term of three representatives selected from Stakeholder Groups with six Council seats shall begin in even-numbered years and the regular term of the other three representatives selected from that Stakeholder Group shall begin in odd-numbered years. The regular term of one of the three members selected by the Nominating Committee shall begin in even-numbered years and the regular term of the other two of the three members selected by the Nominating Committee shall begin in odd-numbered years. Each GNSO Council member shall hold office during his or her regular term and until a successor has been selected and qualified or until that member resigns or is removed in accordance with these Bylaws.

Except in a "special circumstance," such as, but not limited to, meeting geographic or other diversity requirements defined in the Stakeholder Group charters, where no alternative representative is available to serve, no Council member may be selected to serve more than two consecutive terms, in such a special circumstance a Council member may serve one additional term. For these purposes, a person selected to fill a vacancy in a term shall not be deemed to have served that term. A former Council member who has served two consecutive terms must remain out of office for one full term prior to serving any subsequent term as Council member. A "special circumstance" is defined in the GNSO Operating Procedures.

3. A vacancy on the GNSO Council shall be deemed to exist in the case of the death, resignation, or removal of any member. Vacancies shall be filled for the unexpired term by the appropriate Nominating Committee or Stakeholder Group that selected the member holding the position before the vacancy occurred by giving the GNSO Secretariat written notice of its selection. Procedures for handling Stakeholder Group-appointed GNSO Council member vacancies, resignations, and removals are prescribed in the applicable Stakeholder Group Charter.

A GNSO Council member selected by the Nominating Committee may be removed for cause: i) stated by a three-fourths (3/4) vote of all members of the applicable House to which the Nominating Committee appointee is assigned; or ii) stated by a three-fourths (3/4) vote of all members of each House in the case of the non-voting Nominating Committee appointee (see Section 3(8) of this Article). Such removal shall be subject to reversal by the ICANN Board on appeal by the affected GNSO Council member.

4. The GNSO Council is responsible for managing the policy development process of the GNSO. It shall adopt such procedures (the "GNSO Operating Procedures") as it sees fit to carry out that responsibility, provided that such procedures are approved by a majority vote of each House. The GNSO Operating Procedures shall be effective upon the expiration of a twenty-one (21) day public comment period, and shall be subject to Board oversight and review. Until any modifications are recommended by the GNSO Council, the applicable procedures shall be as set forth in Section 6 of this Article.

5. No more than one officer, director or employee of any particular corporation or other organization (including its subsidiaries and affiliates) shall serve on the GNSO Council at any given time.

6. The GNSO shall make selections to fill Seats 13 and 14 on the ICANN Board by written ballot or by action at a meeting. Each of the two voting Houses of the GNSO, as described in Section 3(8) of this Article, shall make a selection to fill one of two ICANN Board seats, as outlined below; any such selection must have affirmative votes comprising sixty percent (60%) of all the respective voting House members:

    a. the Contracted Party House shall select a representative to fill Seat 13; and

    b. the Non-Contracted Party House shall select a representative to fill Seat 14

SER038

Case: 13-55553    11/08/2013    ID: 8857379    DktEntry: 15-2    Page: 41 of 74

Election procedures are defined in the GNSO Operating Procedures.

Notification of the Board seat selections shall be given by the GNSO Chair in writing to the ICANN Secretary, consistent with Article VI, Sections 8(4) and 12(1).

7. The GNSO Council shall select the GNSO Chair for a term the GNSO Council specifies, but not longer than one year. Each House (as described in Section 3.8 of this Article) shall select a Vice-Chair, who will be a Vice-Chair of the whole of the GNSO Council, for a term the GNSO Council specifies, but not longer than one year. The procedures for selecting the Chair and any other officers are contained in the GNSO Operating Procedures. In the event that the GNSO Council has not elected a GNSO Chair by the end of the previous Chair's term, the Vice-Chairs will serve as Interim GNSO Co-Chairs until a successful election can be held.

8. Except as otherwise required in these Bylaws, for voting purposes, the GNSO Council (see Section 3(1) of this Article) shall be organized into a bicameral House structure as described below:

> a. the Contracted Parties House includes the Registries Stakeholder Group (three members), the Registrars Stakeholder Group (three members), and one voting member appointed by the ICANN Nominating Committee for a total of seven voting members; and

> b. the Non Contracted Parties House includes the Commercial Stakeholder Group (six members), the Non-Commercial Stakeholder Group (six members), and one voting member appointed by the ICANN Nominating Committee to that House for a total of thirteen voting members.

Except as otherwise specified in these Bylaws, each member of a voting House is entitled to cast one vote in each separate matter before the GNSO Council.

9. Except as otherwise specified in these Bylaws, Annex A hereto, or the GNSO Operating Procedures, the default threshold to pass a GNSO Council motion or other voting action requires a simple majority vote of each House. The voting thresholds described below shall apply to the following GNSO actions:

> a. Create an Issues Report: requires an affirmative vote of more than 25% vote of each House or majority of one House;

> b. Initiate a Policy Development Process ("PDP") Within Scope (as described in Annex A): requires an affirmative vote of more than 33% of each House or more than 66% of one House;

> c. Initiate a PDP Not Within Scope: requires an affirmative vote of more than 75% of one House and a majority of the other House ("GNSO Supermajority");

> d. Approve a PDP Recommendation Without a GNSO Supermajority: requires an affirmative vote of a majority of each House and further requires that one GNSO Council member representative of at least 3 of the 4 Stakeholder Groups supports the Recommendation;

> e. Approve a PDP Recommendation With a GNSO Supermajority: requires an affirmative vote of a GNSO Supermajority; and

> f. Approve a PDP Recommendation Imposing New Obligations on Certain Contracting Parties: where an ICANN contract provision specifies that "a two-thirds vote of the council" demonstrates the presence of a consensus, the GNSO Supermajority vote threshold will have to be met or exceeded with respect to any contracting party affected by such contract provision.

## Section 4. STAFF SUPPORT AND FUNDING

1. A member of the ICANN staff shall be assigned to support the GNSO, whose work on substantive matters shall be assigned by the Chair of the GNSO Council, and shall be designated as the GNSO Staff Manager (Staff Manager).

2. ICANN shall provide administrative and operational support necessary for the GNSO to carry out its responsibilities. Such support shall not include an obligation for ICANN to fund travel expenses incurred by GNSO participants for travel to any meeting of the GNSO or for any other purpose. ICANN may, at its discretion, fund travel expenses for GNSO participants under any travel support procedures or guidelines that it may adopt from time to time.

## Section 5. STAKEHOLDER GROUPS

1. The following Stakeholder Groups are hereby recognized as representative of a specific group of one or more Constituencies or interest groups and subject to the provisions of the Transition Article XX, Section 5 of these Bylaws:

  a. Registries Stakeholder Group representing all gTLD registries under contract to ICANN;

  b. Registrars Stakeholder Group representing all registrars accredited by and under contract to ICANN;

  c. Commercial Stakeholder Group representing the full range of large and small commercial entities of the Internet; and

  d. Non-Commercial Stakeholder Group representing the full range of non-commercial entities of the Internet.

2. Each Stakeholder Group is assigned a specific number of Council seats in accordance with Section 3(1) of this Article.

3. Each Stakeholder Group identified in paragraph 1 of this Section and each of its associated Constituencies, where applicable, shall maintain recognition with the ICANN Board. Recognition is granted by the Board based upon the extent to which, in fact, the entity represents the global interests of the stakeholder communities it purports to represent and operates to the maximum extent feasible in an open and transparent manner consistent with procedures designed to ensure fairness. Stakeholder Group and Constituency Charters may be reviewed periodically as prescribed by the Board.

4. Any group of individuals or entities may petition the Board for recognition as a new or separate Constituency in the Non-Contracted Parties House. Any such petition shall contain:

  a. A detailed explanation of why the addition of such a Constituency will improve the ability of the GNSO to carry out its policy-development responsibilities;

  b. A detailed explanation of why the proposed new Constituency adequately represents, on a global basis, the stakeholders it seeks to represent;

  c. A recommendation for organizational placement within a particular Stakeholder Group; and

  d. A proposed charter that adheres to the principles and procedures contained in these Bylaws.

Any petition for the recognition of a new Constituency and the associated charter shall be posted for public comment.

5. The Board may create new Constituencies as described in Section 5(3) in response to such a petition, or on its own motion, if the Board determines that such action would serve the purposes of ICANN. In the event the Board is considering acting on its own motion it shall post a detailed explanation of why such action is necessary or desirable, set a reasonable time for public comment, and not make a final decision on whether to create such new Constituency until after reviewing all comments received. Whenever the Board posts a petition or recommendation for a new Constituency for public comment, the Board shall notify the GNSO Council and the appropriate Stakeholder Group affected and shall consider any response to that notification prior to taking action.

Case: 13-55553    11/08/2013    ID: 8857379    DktEntry: 15-2    Page: 43 of 74

### Section 6. POLICY DEVELOPMENT PROCESS

The policy-development procedures to be followed by the GNSO shall be as stated in <u>Annex A</u> to these Bylaws. These procedures may be supplemented or revised in the manner stated in <u>Section 3(4) of this Article</u>.

# ARTICLE XI: ADVISORY COMMITTEES

### Section 1. GENERAL

The Board may create one or more Advisory Committees in addition to those set forth in this Article. Advisory Committee membership may consist of Directors only, Directors and non-directors, or non-directors only, and may also include non-voting or alternate members. Advisory Committees shall have no legal authority to act for ICANN, but shall report their findings and recommendations to the Board.

### Section 2. SPECIFIC ADVISORY COMMITTEES

There shall be at least the following Advisory Committees:

1. Governmental Advisory Committee

    a. The Governmental Advisory Committee should consider and provide advice on the activities of ICANN as they relate to concerns of governments, particularly matters where there may be an interaction between ICANN's policies and various laws and international agreements or where they may affect public policy issues.

    b. Membership in the Governmental Advisory Committee shall be open to all national governments. Membership shall also be open to Distinct Economies as recognized in international fora, and multinational governmental organizations and treaty organizations, on the invitation of the Governmental Advisory Committee through its Chair.

    c. The Governmental Advisory Committee may adopt its own charter and internal operating principles or procedures to guide its operations, to be published on the Website.

    d. The chair of the Governmental Advisory Committee shall be elected by the members of the Governmental Advisory Committee pursuant to procedures adopted by such members.

    e. Each member of the Governmental Advisory Committee shall appoint one accredited representative to the Committee. The accredited representative of a member must hold a formal official position with the member's public administration. The term "official" includes a holder of an elected governmental office, or a person who is employed by such government, public authority, or multinational governmental or treaty organization and whose primary function with such government, public authority, or organization is to develop or influence governmental or public policies.

    f. The Governmental Advisory Committee shall annually appoint one non-voting liaison to the ICANN Board of Directors, without limitation on reappointment, and shall annually appoint one non-voting liaison to the ICANN Nominating Committee.

    g. The Governmental Advisory Committee may designate a non-voting liaison to each of the Supporting Organization Councils and Advisory Committees, to the extent the Governmental Advisory Committee deems it appropriate and useful to do so.

    h. The Board shall notify the Chair of the Governmental Advisory Committee in a timely manner of any proposal raising public policy issues on which it or any of ICANN's supporting organizations or advisory committees seeks public comment, and shall take duly into account any timely response to that notification prior to taking action.

    i. The Governmental Advisory Committee may put issues to the Board directly, either by way of

**EXHIBIT B**
38

SER041

comment or prior advice, or by way of specifically recommending action or new policy development or revision to existing policies.

j. The advice of the Governmental Advisory Committee on public policy matters shall be duly taken into account, both in the formulation and adoption of policies. In the event that the ICANN Board determines to take an action that is not consistent with the Governmental Advisory Committee advice, it shall so inform the Committee and state the reasons why it decided not to follow that advice. The Governmental Advisory Committee and the ICANN Board will then try, in good faith and in a timely and efficient manner, to find a mutually acceptable solution.

k. If no such solution can be found, the ICANN Board will state in its final decision the reasons why the Governmental Advisory Committee advice was not followed, and such statement will be without prejudice to the rights or obligations of Governmental Advisory Committee members with regard to public policy issues falling within their responsibilities.

2. Security and Stability Advisory Committee

a. The role of the Security and Stability Advisory Committee ("SSAC") is to advise the ICANN community and Board on matters relating to the security and integrity of the Internet's naming and address allocation systems. It shall have the following responsibilities:

   1. To communicate on security matters with the Internet technical community and the operators and managers of critical DNS infrastructure services, to include the root name server operator community, the top-level domain registries and registrars, the operators of the reverse delegation trees such as in-addr.arpa and ip6.arpa, and others as events and developments dictate. The Committee shall gather and articulate requirements to offer to those engaged in technical revision of the protocols related to DNS and address allocation and those engaged in operations planning.

   2. To engage in ongoing threat assessment and risk analysis of the Internet naming and address allocation services to assess where the principal threats to stability and security lie, and to advise the ICANN community accordingly. The Committee shall recommend any necessary audit activity to assess the current status of DNS and address allocation security in relation to identified risks and threats.

   3. To communicate with those who have direct responsibility for Internet naming and address allocation security matters (IETF, RSSAC, RIRs, name registries, etc.), to ensure that its advice on security risks, issues, and priorities is properly synchronized with existing standardization, deployment, operational, and coordination activities. The Committee shall monitor these activities and inform the ICANN community and Board on their progress, as appropriate.

   4. To report periodically to the Board on its activities.

   5. To make policy recommendations to the ICANN community and Board.

b. The SSAC's chair and members shall be appointed by the Board. SSAC membership appointment shall be for a three-year term, commencing on 1 January and ending the second year thereafter on 31 December. The chair and members may be re-appointed, and there are no limits to the number of terms the chair or members may serve. The SSAC chair may provide recommendations to the Board regarding appointments to the SSAC. The SSAC chair shall stagger appointment recommendations so that approximately one-third (1/3) of the membership of the SSAC is considered for appointment or re-appointment each year. The Board shall also have to power to remove SSAC appointees as recommended by or in consultation with the SSAC. (Note: The first full term under this paragraph shall commence on 1 January 2011 and end on 31 December 2013. Prior to 1 January 2011, the SSAC shall be comprised as stated in the Bylaws as amended 25 June 2010, and the SSAC chair shall

EXHIBIT B

39

Case: 13-55553    11/08/2013    ID: 8857379    DktEntry: 15-2    Page: 45 of 74
Case 2:12-cv-08676-PA-PLA   Document 20   Filed 11/30/12   Page 43 of 72   Page ID #:175

recommend the re-appointment of all current SSAC members to full or partial terms as appropriate to implement the provisions of this paragraph.)

c. The SSAC shall annually appoint a non-voting liaison to the ICANN Board according to Section 9 of Article VI.

3. Root Server System Advisory Committee

a. The role of the Root Server System Advisory Committee ("RSSAC") shall be to advise the Board about the operation of the root name servers of the domain name system. The RSSAC shall consider and provide advice on the operational requirements of root name servers, including host hardware capacities, operating systems and name server software versions, network connectivity and physical environment. The RSSAC shall examine and advise on the security aspects of the root name server system. Further, the RSSAC shall review the number, location, and distribution of root name servers considering the total system performance, robustness, and reliability.

b. Membership in the RSSAC shall consist of (i) each operator of an authoritative root name server (as listed at <ftp://ftp.internic.net/domain/named.root>), and (ii) such other persons as are appointed by the ICANN Board.

c. The initial chairman of the DNS Root Server System Advisory Committee shall be appointed by the Board; subsequent chairs shall be elected by the members of the DNS Root Server System Advisory Committee pursuant to procedures adopted by the members.

d. The Root Server System Advisory Committee shall annually appoint one non-voting liaison to the ICANN Board of Directors, without limitation on re-appointment, and shall annually appoint one non-voting liaison to the ICANN Nominating Committee.

4. At-Large Advisory Committee

a. The At-Large Advisory Committee (ALAC) is the primary organizational home within ICANN for individual Internet users. The role of the ALAC shall be to consider and provide advice on the activities of ICANN, insofar as they relate to the interests of individual Internet users. This includes policies created through ICANN's Supporting Organizations, as well as the many other issues for which community input and advice is appropriate. The ALAC, which plays an important role in ICANN's accountability mechanisms, also coordinates some of ICANN's outreach to individual Internet users.

b. The ALAC shall consist of (i) two members selected by each of the Regional At-Large Organizations ("RALOs") established according to paragraph 4(g) of this Section, and (ii) five members selected by the Nominating Committee. The five members selected by the Nominating Committee shall include one citizen of a country within each of the five Geographic Regions established according to Section 5 of Article VI.

c. Subject to the provisions of the Transition Article of these Bylaws, the regular terms of members of the ALAC shall be as follows:

1. The term of one member selected by each RALO shall begin at the conclusion of an ICANN annual meeting in an even-numbered year.

2. The term of the other member selected by each RALO shall begin at the conclusion of an ICANN annual meeting in an odd-numbered year.

3. The terms of three of the members selected by the Nominating Committee shall begin at the conclusion of an annual meeting in an odd-numbered year and the terms of the other two members selected by the Nominating Committee shall begin at the conclusion of an annual meeting in an even-numbered year.

EXHIBIT B
40

SER043

      4. The regular term of each member shall end at the conclusion of the second ICANN annual meeting after the term began.

d. The Chair of the ALAC shall be elected by the members of the ALAC pursuant to procedures adopted by the Committee.

e. The ALAC shall, after consultation with each RALO, annually appoint five voting delegates (no two of whom shall be citizens of countries in the same Geographic Region, as defined according to Section 5 of Article VI) to the Nominating Committee.

f. Subject to the provisions of the Transition Article of these Bylaws, the At-Large Advisory Committee may designate non-voting liaisons to each of the ccNSO Council and the GNSO Council.

g. There shall be one RALO for each Geographic Region established according to Section 5 of Article VI. Each RALO shall serve as the main forum and coordination point for public input to ICANN in its Geographic Region and shall be a non-profit organization certified by ICANN according to criteria and standards established by the Board based on recommendations of the At-Large Advisory Committee. An organization shall become the recognized RALO for its Geographic Region upon entering a Memorandum of Understanding with ICANN addressing the respective roles and responsibilities of ICANN and the RALO regarding the process for selecting ALAC members and requirements of openness, participatory opportunities, transparency, accountability, and diversity in the RALO's structure and procedures, as well as criteria and standards for the RALO's constituent At-Large Structures.

h. Each RALO shall be comprised of self-supporting At-Large Structures within its Geographic Region that have been certified to meet the requirements of the RALO's Memorandum of Understanding with ICANN according to paragraph 4(i) of this Section. If so provided by its Memorandum of Understanding with ICANN, a RALO may also include individual Internet users who are citizens or residents of countries within the RALO's Geographic Region.

i. Membership in the At-Large Community

    1. The criteria and standards for the certification of At-Large Structures within each Geographic Region shall be established by the Board based on recommendations from the ALAC and shall be stated in the Memorandum of Understanding between ICANN and the RALO for each Geographic Region.

    2. The criteria and standards for the certification of At-Large Structures shall be established in such a way that participation by individual Internet users who are citizens or residents of countries within the Geographic Region (as defined in Section 5 of Article VI) of the RALO will predominate in the operation of each At-Large Structure within the RALO, while not necessarily excluding additional participation, compatible with the interests of the individual Internet users within the region, by others.

    3. Each RALO's Memorandum of Understanding shall also include provisions designed to allow, to the greatest extent possible, every individual Internet user who is a citizen of a country within the RALO's Geographic Region to participate in at least one of the RALO's At-Large Structures.

    4. To the extent compatible with these objectives, the criteria and standards should also afford to each RALO the type of structure that best fits the customs and character of its Geographic Region.

    5. Once the criteria and standards have been established as provided in this Clause i, the ALAC, with the advice and participation of the RALO where the applicant is based, shall be responsible for certifying organizations as meeting the criteria and standards for At-Large Structure accreditation.

    6. Decisions to certify or decertify an At-Large Structure shall be made as decided by the ALAC in its Rules of Procedure, save always that any changes made to the Rules of Procedure in respect of ALS applications shall be subject to review by the RALOs and by the ICANN Board.

    7. Decisions as to whether to accredit, not to accredit, or disaccredit an At-Large Structure shall be subject to review according to procedures established by the Board.

    8. On an ongoing basis, the ALAC may also give advice as to whether a prospective At-

http://www.icann.org/en/general/bylaws.htm

Case: 13-55553    11/08/2013    ID: 8857379    DktEntry: 15-2    Page: 47 of 74
Case 2:12-cv-08676-PA-PLA   Document 20   Filed 11/30/12   Page 45 of 72   Page ID #:177

Large Structure meets the applicable criteria and standards.

j. The ALAC is also responsible, working in conjunction with the RALOs, for coordinating the following activities:

1. Making a selection by the At-Large Community to fill Seat 15 on the Board. Notification of the At-Large Community's selection shall be given by the ALAC Chair in writing to the ICANN Secretary, consistent with Article VI, Sections 8(4) and 12(1).

2. Keeping the community of individual Internet users informed about the significant news from ICANN;

3. Distributing (through posting or otherwise) an updated agenda, news about ICANN, and information about items in the ICANN policy-development process;

4. Promoting outreach activities in the community of individual Internet users;

5. Developing and maintaining on-going information and education programs, regarding ICANN and its work;

6. Establishing an outreach strategy about ICANN issues in each RALO's Region;

7. Participating in the ICANN policy development processes and providing input and advice that accurately reflects the views of individual Internet users;

8. Making public, and analyzing, ICANN's proposed policies and its decisions and their (potential) regional impact and (potential) effect on individuals in the region;

9. Offering Internet-based mechanisms that enable discussions among members of At-Large structures; and

10. Establishing mechanisms and processes that enable two-way communication between members of At-Large Structures and those involved in ICANN decision-making, so interested individuals can share their views on pending ICANN issues.

**Section 3. PROCEDURES**

Each Advisory Committee shall determine its own rules of procedure and quorum requirements.

**Section 4. TERM OF OFFICE**

The chair and each member of a committee shall serve until his or her successor is appointed, or until such committee is sooner terminated, or until he or she is removed, resigns, or otherwise ceases to qualify as a member of the committee.

**Section 5. VACANCIES**

Vacancies on any committee shall be filled in the same manner as provided in the case of original appointments.

**Section 6. COMPENSATION**

Committee members shall receive no compensation for their services as a member of a committee. The Board may, however, authorize the reimbursement of actual and necessary expenses incurred by committee members, including Directors, performing their duties as committee members.

EXHIBIT B
42

# ARTICLE XI-A: OTHER ADVISORY MECHANISMS

## Section 1. EXTERNAL EXPERT ADVICE

1. Purpose. The purpose of seeking external expert advice is to allow the policy-development process within ICANN to take advantage of existing expertise that resides in the public or private sector but outside of ICANN. In those cases where there are relevant public bodies with expertise, or where access to private expertise could be helpful, the Board and constituent bodies should be encouraged to seek advice from such expert bodies or individuals.

2. Types of Expert Advisory Panels.

a. On its own initiative or at the suggestion of any ICANN body, the Board may appoint, or authorize the President to appoint, Expert Advisory Panels consisting of public or private sector individuals or entities. If the advice sought from such Panels concerns issues of public policy, the provisions of Section 1(3)(b) of this Article shall apply.

b. In addition, in accordance with Section 1(3) of this Article, the Board may refer issues of public policy pertinent to matters within ICANN's mission to a multinational governmental or treaty organization.

3. Process for Seeking Advice-Public Policy Matters.

a. The Governmental Advisory Committee may at any time recommend that the Board seek advice concerning one or more issues of public policy from an external source, as set out above.

b. In the event that the Board determines, upon such a recommendation or otherwise, that external advice should be sought concerning one or more issues of public policy, the Board shall, as appropriate, consult with the Governmental Advisory Committee regarding the appropriate source from which to seek the advice and the arrangements, including definition of scope and process, for requesting and obtaining that advice.

c. The Board shall, as appropriate, transmit any request for advice from a multinational governmental or treaty organization, including specific terms of reference, to the Governmental Advisory Committee, with the suggestion that the request be transmitted by the Governmental Advisory Committee to the multinational governmental or treaty organization.

4. Process for Seeking and Advice-Other Matters. Any reference of issues not concerning public policy to an Expert Advisory Panel by the Board or President in accordance with Section 1(2)(a) of this Article shall be made pursuant to terms of reference describing the issues on which input and advice is sought and the procedures and schedule to be followed.

5. Receipt of Expert Advice and its Effect. External advice pursuant to this Section shall be provided in written form. Such advice is advisory and not binding, and is intended to augment the information available to the Board or other ICANN body in carrying out its responsibilities.

6. Opportunity to Comment. The Governmental Advisory Committee, in addition to the Supporting Organizations and other Advisory Committees, shall have an opportunity to comment upon any external advice received prior to any decision by the Board.

## Section 2. TECHNICAL LIAISON GROUP

1. Purpose. The quality of ICANN's work depends on access to complete and authoritative information concerning the technical standards that underlie ICANN's activities. ICANN's relationship to the organizations that produce these standards is therefore particularly important. The Technical Liaison Group (TLG) shall connect the Board with appropriate sources of technical advice on specific matters pertinent to ICANN's activities.

EXHIBIT B
43

Case: 13-55553    11/08/2013    ID: 8857379    DktEntry: 15-2    Page: 49 of 74

2. TLG Organizations. The TLG shall consist of four organizations: the European Telecommunications Standards Institute (ETSI), the International Telecommunications Union's Telecommunication Standardization Sector (ITU-T), the World Wide Web Consortium (W3C), and the Internet Architecture Board (IAB).

3. Role. The role of the TLG organizations shall be to channel technical information and guidance to the Board and to other ICANN entities. This role has both a responsive component and an active "watchdog" component, which involve the following responsibilities:

     a. In response to a request for information, to connect the Board or other ICANN body with appropriate sources of technical expertise. This component of the TLG role covers circumstances in which ICANN seeks an authoritative answer to a specific technical question. Where information is requested regarding a particular technical standard for which a TLG organization is responsible, that request shall be directed to that TLG organization.

     b. As an ongoing "watchdog" activity, to advise the Board of the relevance and progress of technical developments in the areas covered by each organization's scope that could affect Board decisions or other ICANN actions, and to draw attention to global technical standards issues that affect policy development within the scope of ICANN's mission. This component of the TLG role covers circumstances in which ICANN is unaware of a new development, and would therefore otherwise not realize that a question should be asked.

4. TLG Procedures. The TLG shall not have officers or hold meetings, nor shall it provide policy advice to the Board as a committee (although TLG organizations may individually be asked by the Board to do so as the need arises in areas relevant to their individual charters). Neither shall the TLG debate or otherwise coordinate technical issues across the TLG organizations; establish or attempt to establish unified positions; or create or attempt to create additional layers or structures within the TLG for the development of technical standards or for any other purpose.

5. Technical Work of the IANA. The TLG shall have no involvement with the IANA's work for the Internet Engineering Task Force, Internet Research Task Force, or the Internet Architecture Board, as described in the Memorandum of Understanding Concerning the Technical Work of the Internet Assigned Numbers Authority ratified by the Board on 10 March 2000.

6. Individual Technical Experts. Each TLG organization shall designate two individual technical experts who are familiar with the technical standards issues that are relevant to ICANN's activities. These 8 experts shall be available as necessary to determine, through an exchange of e-mail messages, where to direct a technical question from ICANN when ICANN does not ask a specific TLG organization directly.

7. Board Liaison and Nominating Committee Delegate. Annually, in rotation, one TLG organization shall appoint one non-voting liaison to the Board according to Article VI, Section 9(1)(d). Annually, in rotation, one TLG organization shall select one voting delegate to the ICANN Nominating Committee according to Article VII, Section 2(8)(j). The rotation order for the appointment of the non-voting liaison to the Board shall be ETSI, ITU-T, and W3C. The rotation order for the selection of the Nominating Committee delegate shall be W3C, ETSI, and ITU-T. (IAB does not participate in these rotations because the IETF otherwise appoints a non-voting liaison to the Board and selects a delegate to the ICANN Nominating Committee.)

# ARTICLE XII: BOARD AND TEMPORARY COMMITTEES

## Section 1. BOARD COMMITTEES

The Board may establish one or more committees of the Board, which shall continue to exist until otherwise determined by the Board. Only Directors may be appointed to a Committee of the Board. If a person appointed to a Committee of the Board ceases to be a Director, such person shall also cease to be a member of any Committee of the Board. Each Committee of the Board shall consist of two or more Directors. The Board may designate one or more Directors as alternate members of any such committee, who may replace any absent member at any meeting of the committee. Committee members may be removed from a committee at any time by a two-thirds (2/3) majority vote of all members of the Board; provided, however, that any Director or Directors which are the subject of the removal action shall not be entitled to vote on such an action or be counted as a member of the Board when calculating the required two-thirds (2/3) vote; and, provided further, however, that in no event shall a Director be removed from a committee unless such removal

**EXHIBIT B**

is approved by not less than a majority of all members of the Board.

## Section 2. POWERS OF BOARD COMMITTEES

1. The Board may delegate to Committees of the Board all legal authority of the Board except with respect to:

    a. The filling of vacancies on the Board or on any committee;

    b. The amendment or repeal of Bylaws or the Articles of Incorporation or the adoption of new Bylaws or Articles of Incorporation;

    c. The amendment or repeal of any resolution of the Board which by its express terms is not so amendable or repealable;

    d. The appointment of committees of the Board or the members thereof;

    e. The approval of any self-dealing transaction, as such transactions are defined in Section 5233(a) of the CNPBCL;

    f. The approval of the annual budget required by Article XVI; or

    g. The compensation of any officer described in Article XIII.

2. The Board shall have the power to prescribe the manner in which proceedings of any Committee of the Board shall be conducted. In the absence of any such prescription, such committee shall have the power to prescribe the manner in which its proceedings shall be conducted. Unless these Bylaws, the Board or such committee shall otherwise provide, the regular and special meetings shall be governed by the provisions of Article VI applicable to meetings and actions of the Board. Each committee shall keep regular minutes of its proceedings and shall report the same to the Board from time to time, as the Board may require.

## Section 3. TEMPORARY COMMITTEES

The Board may establish such temporary committees as it sees fit, with membership, duties, and responsibilities as set forth in the resolutions or charters adopted by the Board in establishing such committees.

# ARTICLE XIII: OFFICERS

## Section 1. OFFICERS

The officers of ICANN shall be a President (who shall serve as Chief Executive Officer), a Secretary, and a Chief Financial Officer. ICANN may also have, at the discretion of the Board, any additional officers that it deems appropriate. Any person, other than the President, may hold more than one office, except that no member of the Board (other than the President) shall simultaneously serve as an officer of ICANN.

## Section 2. ELECTION OF OFFICERS

The officers of ICANN shall be elected annually by the Board, pursuant to the recommendation of the President or, in the case of the President, of the Chairman of the ICANN Board. Each such officer shall hold his or her office until he or she resigns, is removed, is otherwise disqualified to serve, or his or her successor is elected.

## Section 3. REMOVAL OF OFFICERS

Any Officer may be removed, either with or without cause, by a two-thirds (2/3) majority vote of all the members of the Board. Should any vacancy occur in any office as a result of death, resignation, removal, disqualification, or any other cause, the Board may delegate the powers and duties of such office to any Officer or to any Director until such time as a successor for the office has been elected.

EXHIBIT B
45

Case: 13-55553   11/08/2013   ID: 8857379   DktEntry: 15-2   Page: 51 of 74

## Section 4. PRESIDENT

The President shall be the Chief Executive Officer (CEO) of ICANN in charge of all of its activities and business. All other officers and staff shall report to the President or his or her delegate, unless stated otherwise in these Bylaws. The President shall serve as an ex officio member of the Board, and shall have all the same rights and privileges of any Board member. The President shall be empowered to call special meetings of the Board as set forth herein, and shall discharge all other duties as may be required by these Bylaws and from time to time may be assigned by the Board.

## Section 5. SECRETARY

The Secretary shall keep or cause to be kept the minutes of the Board in one or more books provided for that purpose, shall see that all notices are duly given in accordance with the provisions of these Bylaws or as required by law, and in general shall perform all duties as from time to time may be prescribed by the President or the Board.

## Section 6. CHIEF FINANCIAL OFFICER

The Chief Financial Officer ("CFO") shall be the chief financial officer of ICANN. If required by the Board, the CFO shall give a bond for the faithful discharge of his or her duties in such form and with such surety or sureties as the Board shall determine. The CFO shall have charge and custody of all the funds of ICANN and shall keep or cause to be kept, in books belonging to ICANN, full and accurate amounts of all receipts and disbursements, and shall deposit all money and other valuable effects in the name of ICANN in such depositories as may be designated for that purpose by the Board. The CFO shall disburse the funds of ICANN as may be ordered by the Board or the President and, whenever requested by them, shall deliver to the Board and the President an account of all his or her transactions as CFO and of the financial condition of ICANN. The CFO shall be responsible for ICANN's financial planning and forecasting and shall assist the President in the preparation of ICANN's annual budget. The CFO shall coordinate and oversee ICANN's funding, including any audits or other reviews of ICANN or its Supporting Organizations. The CFO shall be responsible for all other matters relating to the financial operation of ICANN.

## Section 7. ADDITIONAL OFFICERS

In addition to the officers described above, any additional or assistant officers who are elected or appointed by the Board shall perform such duties as may be assigned to them by the President or the Board.

## Section 8. COMPENSATION AND EXPENSES

The compensation of any Officer of ICANN shall be approved by the Board. Expenses incurred in connection with performance of their officer duties may be reimbursed to Officers upon approval of the President (in the case of Officers other than the President), by another Officer designated by the Board (in the case of the President), or the Board.

## Section 9. CONFLICTS OF INTEREST

The Board, through the Board Governance Committee, shall establish a policy requiring a statement from each Officer not less frequently than once a year setting forth all business and other affiliations that relate in any way to the business and other affiliations of ICANN.

# ARTICLE XIV: INDEMNIFICATION OF DIRECTORS, OFFICERS, EMPLOYEES, AND OTHER AGENTS

ICANN shall, to maximum extent permitted by the CNPBCL, indemnify each of its agents against expenses, judgments, fines, settlements, and other amounts actually and reasonably incurred in connection with any proceeding arising by reason of the fact that any such person is or was an agent of ICANN, provided that the indemnified person's acts were done in good faith and in a manner that the indemnified person reasonably believed to be in ICANN's best interests and not criminal. For purposes of this Article, an "agent" of ICANN includes any person who is or was a Director, Officer, employee, or any other agent of ICANN (including a member of any Supporting Organization, any Advisory Committee, the Nominating Committee, any other ICANN committee, or the Technical Liaison Group) acting within the scope of his or her responsibility; or is or was serving at the request of ICANN as a Director, Officer, employee, or agent of another corporation, partnership, joint venture, trust, or other enterprise. The Board may adopt a resolution authorizing the purchase and maintenance of insurance on behalf of any agent of ICANN against any liability asserted against or incurred by the agent in such capacity or arising out of the agent's status as such, whether or not ICANN would have the power to

SER049

indemnify the agent against that liability under the provisions of this Article.

# ARTICLE XV: GENERAL PROVISIONS

### Section 1. CONTRACTS

The Board may authorize any Officer or Officers, agent or agents, to enter into any contract or execute or deliver any instrument in the name of and on behalf of ICANN, and such authority may be general or confined to specific instances. In the absence of a contrary Board authorization, contracts and instruments may only be executed by the following Officers: President, any Vice President, or the CFO. Unless authorized or ratified by the Board, no other Officer, agent, or employee shall have any power or authority to bind ICANN or to render it liable for any debts or obligations.

### Section 2. DEPOSITS

All funds of ICANN not otherwise employed shall be deposited from time to time to the credit of ICANN in such banks, trust companies, or other depositories as the Board, or the President under its delegation, may select.

### Section 3. CHECKS

All checks, drafts, or other orders for the payment of money, notes, or other evidences of indebtedness issued in the name of ICANN shall be signed by such Officer or Officers, agent or agents, of ICANN and in such a manner as shall from time to time be determined by resolution of the Board.

### Section 4. LOANS

No loans shall be made by or to ICANN and no evidences of indebtedness shall be issued in its name unless authorized by a resolution of the Board. Such authority may be general or confined to specific instances; provided, however, that no loans shall be made by ICANN to its Directors or Officers.

# ARTICLE XVI: FISCAL MATTERS

### Section 1. ACCOUNTING

The fiscal year end of ICANN shall be determined by the Board.

### Section 2. AUDIT

At the end of the fiscal year, the books of ICANN shall be closed and audited by certified public accountants. The appointment of the fiscal auditors shall be the responsibility of the Board.

### Section 3. ANNUAL REPORT AND ANNUAL STATEMENT

The Board shall publish, at least annually, a report describing its activities, including an audited financial statement and a description of any payments made by ICANN to Directors (including reimbursements of expenses). ICANN shall cause the annual report and the annual statement of certain transactions as required by the CNPBCL to be prepared and sent to each member of the Board and to such other persons as the Board may designate, no later than one hundred twenty (120) days after the close of ICANN's fiscal year.

### Section 4. ANNUAL BUDGET

At least forty-five (45) days prior to the commencement of each fiscal year, the President shall prepare and submit to the Board, a proposed annual budget of ICANN for the next fiscal year, which shall be posted on the Website. The proposed budget shall identify anticipated revenue sources and levels and shall, to the extent practical, identify anticipated material expense items by line item. The Board shall adopt an annual budget and shall publish the adopted Budget on the Website.

### Section 5. FEES AND CHARGES

EXHIBIT B

47

SER050

1/20/2012

Case: 13-55553    11/08/2013    ID: 8857379    DktEntry: 15-2    Page: 53 of 74

The Board may set fees and charges for the services and benefits provided by ICANN, with the goal of fully recovering the reasonable costs of the operation of ICANN and establishing reasonable reserves for future expenses and contingencies reasonably related to the legitimate activities of ICANN. Such fees and charges shall be fair and equitable, shall be published for public comment prior to adoption, and once adopted shall be published on the Website in a sufficiently detailed manner so as to be readily accessible.

# ARTICLE XVII: MEMBERS

ICANN shall not have members, as defined in the California Nonprofit Public Benefit Corporation Law ("CNPBCL"), notwithstanding the use of the term "Member" in these Bylaws, in any ICANN document, or in any action of the ICANN Board or staff.

# ARTICLE XVIII: OFFICES AND SEAL

### Section 1. OFFICES

The principal office for the transaction of the business of ICANN shall be in the County of Los Angeles, State of California, United States of America. ICANN may also have an additional office or offices within or outside the United States of America as it may from time to time establish.

### Section 2. SEAL

The Board may adopt a corporate seal and use the same by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise.

# ARTICLE XIX: AMENDMENTS

Except as otherwise provided in the Articles of Incorporation or these Bylaws, the Articles of Incorporation or Bylaws of ICANN may be altered, amended, or repealed and new Articles of Incorporation or Bylaws adopted only upon action by a two-thirds (2/3) vote of all members of the Board.

# ARTICLE XX: TRANSITION ARTICLE

### Section 1. PURPOSE

This Transition Article sets forth the provisions for the transition from the processes and structures defined by the ICANN Bylaws, as amended and restated on 29 October 1999 and amended through 12 February 2002 (the "Old Bylaws"), to the processes and structures defined by the Bylaws of which this Article is a part (the "New Bylaws"). [Explanatory Note (dated 10 December 2009): For Section 5(3) of this Article, reference to the Old Bylaws refers to the Bylaws as amended and restated through to 20 March 2009.]

### Section 2. BOARD OF DIRECTORS

1. For the period beginning on the adoption of this Transition Article and ending on the Effective Date and Time of the New Board, as defined in paragraph 5 of this Section 2, the Board of Directors of the Corporation ("Transition Board") shall consist of the members of the Board who would have been Directors under the Old Bylaws immediately after the conclusion of the annual meeting in 2002, except that those At-Large members of the Board under the Old Bylaws who elect to do so by notifying the Secretary of the Board on 15 December 2002 or in writing or by e-mail no later than 23 December 2002 shall also serve as members of the Transition Board. Notwithstanding the provisions of Article VI, Section 12 of the New Bylaws, vacancies on the Transition Board shall not be filled. The Transition Board shall not have liaisons as provided by Article VI, Section 9 of the New Bylaws. The Board Committees existing on the date of adoption of this Transition Article shall continue in existence, subject to any change in Board Committees or their membership that the Transition Board may adopt by resolution.

2. The Transition Board shall elect a Chair and Vice-Chair to serve until the Effective Date and Time of the New Board.

SER051

3. The "New Board" is that Board described in Article VI, Section 2(1) of the New Bylaws.

4. Promptly after the adoption of this Transition Article, a Nominating Committee shall be formed including, to the extent feasible, the delegates and liaisons described in Article VII, Section 2 of the New Bylaws, with terms to end at the conclusion of the ICANN annual meeting in 2003. The Nominating Committee shall proceed without delay to select Directors to fill Seats 1 through 8 on the New Board, with terms to conclude upon the commencement of the first regular terms specified for those Seats in Article VI, Section 8(1)(a)-(c) of the New Bylaws, and shall give the ICANN Secretary written notice of that selection.

5. The Effective Date and Time of the New Board shall be a time, as designated by the Transition Board, during the first regular meeting of ICANN in 2003 that begins not less than seven calendar days after the ICANN Secretary has received written notice of the selection of Directors to fill at least ten of Seats 1 through 14 on the New Board. As of the Effective Date and Time of the New Board, it shall assume from the Transition Board all the rights, duties, and obligations of the ICANN Board of Directors. Subject to Section 4 of this Article, the Directors (Article VI, Section 2(1)(a)-(d)) and non-voting liaisons (Article VI, Section 9) as to which the ICANN Secretary has received notice of selection shall, along with the President (Article VI, Section 2(1)(e)), be seated upon the Effective Date and Time of the New Board, and thereafter any additional Directors and non-voting liaisons shall be seated upon the ICANN Secretary's receipt of notice of their selection.

6. The New Board shall elect a Chairman and Vice-Chairman as its first order of business. The terms of those Board offices shall expire at the end of the annual meeting in 2003.

7. Committees of the Board in existence as of the Effective Date and Time of the New Board shall continue in existence according to their existing charters, but the terms of all members of those committees shall conclude at the Effective Date and Time of the New Board. Temporary committees in existence as of the Effective Date and Time of the New Board shall continue in existence with their existing charters and membership, subject to any change the New Board may adopt by resolution.

8. In applying the term-limitation provision of Section 8(5) of Article VI, a Director's service on the Board before the Effective Date and Time of the New Board shall count as one term.

## Section 3. ADDRESS SUPPORTING ORGANIZATION

The Address Supporting Organization shall continue in operation according to the provisions of the Memorandum of Understanding originally entered on 18 October 1999 between ICANN and a group of regional Internet registries (RIRs), and amended in October 2000, until a replacement Memorandum of Understanding becomes effective. Promptly after the adoption of this Transition Article, the Address Supporting Organization shall make selections, and give the ICANN Secretary written notice of those selections, of:

1. Directors to fill Seats 9 and 10 on the New Board, with terms to conclude upon the commencement of the first regular terms specified for each of those Seats in Article VI, Section 8(1)(d) and (e) of the New Bylaws; and

2. the delegate to the Nominating Committee selected by the Council of the Address Supporting Organization, as called for in Article VII, Section 2(8)(f) of the New Bylaws.

With respect to the ICANN Directors that it is entitled to select, and taking into account the need for rapid selection to ensure that the New Board becomes effective as soon as possible, the Address Supporting Organization may select those Directors from among the persons it previously selected as ICANN Directors pursuant to the Old Bylaws. To the extent the Address Supporting Organization does not provide the ICANN Secretary written notice, on or before 31 March 2003, of its selections for Seat 9 and Seat 10, the Address Supporting Organization shall be deemed to have selected for Seat 9 the person it selected as an ICANN Director pursuant to the Old Bylaws for a term beginning in 2001 and for Seat 10 the person it selected as an ICANN Director pursuant to the Old Bylaws for a term beginning in 2002.

## Section 4. COUNTRY-CODE NAMES SUPPORTING ORGANIZATION

1. Upon the enrollment of thirty ccTLD managers (with at least four within each Geographic Region) as members of the ccNSO, written notice shall be posted on the Website. As soon as feasible after that notice, the members of the initial ccNSO Council to be selected by the ccNSO members shall be selected according

Case: 13-55553    11/08/2013    ID: 8857379    DktEntry: 15-2    Page: 55 of 74
Case 2:12-cv-08676-PA-PLA    Document 20    Filed 11/30/12    Page 53 of 72    Page ID #:185

to the procedures stated in Article IX, Section 4(8) and (9). Upon the completion of that selection process, a written notice that the ccNSO Council has been constituted shall be posted on the Website. Three ccNSO Council members shall be selected by the ccNSO members within each Geographic Region, with one member to serve a term that ends upon the conclusion of the first ICANN annual meeting after the ccNSO Council is constituted, a second member to serve a term that ends upon the conclusion of the second ICANN annual meeting after the ccNSO Council is constituted, and the third member to serve a term that ends upon the conclusion of the third ICANN annual meeting after the ccNSO Council is constituted. (The definition of "ccTLD manager" stated in Article IX, Section 4(1) and the definitions stated in Article IX, Section 4(4) shall apply within this Section 4 of Article XX.)

2. After the adoption of Article IX of these Bylaws, the Nominating Committee shall select the three members of the ccNSO Council described in Article IX, Section 3(1)(b). In selecting three individuals to serve on the ccNSO Council, the Nominating Committee shall designate one to serve a term that ends upon the conclusion of the first ICANN annual meeting after the ccNSO Council is constituted, a second member to serve a term that ends upon the conclusion of the second ICANN annual meeting after the ccNSO Council is constituted, and the third member to serve a term that ends upon the conclusion of the third ICANN annual meeting after the ccNSO Council is constituted. The three members of the ccNSO Council selected by the Nominating Committee shall not take their seats before the ccNSO Council is constituted.

3. Upon the ccNSO Council being constituted, the At-Large Advisory Committee and the Governmental Advisory Committee may designate one liaison each to the ccNSO Council, as provided by Article IX, Section 3(2)(a) and (b).

4. Upon the ccNSO Council being constituted, the Council may designate Regional Organizations as provided in Article IX, Section 5. Upon its designation, a Regional Organization may appoint a liaison to the ccNSO Council.

5. Until the ccNSO Council is constituted, Seats 11 and 12 on the New Board shall remain vacant. Promptly after the ccNSO Council is constituted, the ccNSO shall, through the ccNSO Council, make selections of Directors to fill Seats 11 and 12 on the New Board, with terms to conclude upon the commencement of the next regular term specified for each of those Seats in Article VI, Section 8(1)(d) and (f) of the New Bylaws, and shall give the ICANN Secretary written notice of its selections.

6. Until the ccNSO Council is constituted, the delegate to the Nominating Committee established by the New Bylaws designated to be selected by the ccNSO shall be appointed by the Transition Board or New Board, depending on which is in existence at the time any particular appointment is required, after due consultation with members of the ccTLD community. Upon the ccNSO Council being constituted, the delegate to the Nominating Committee appointed by the Transition Board or New Board according to this Section 4(9) then serving shall remain in office, except that the ccNSO Council may replace that delegate with one of its choosing within three months after the conclusion of ICANN's annual meeting, or in the event of a vacancy. Subsequent appointments of the Nominating Committee delegate described in Article VII, Section 2(8)(c) shall be made by the ccNSO Council.

## Section 5. GENERIC NAMES SUPPORTING ORGANIZATION

1. The Generic Names Supporting Organization ("GNSO"), upon the adoption of this Transition Article, shall continue its operations; however, it shall be restructured into four new Stakeholder Groups which shall represent, organizationally, the former Constituencies of the GNSO, subject to ICANN Board approval of each individual Stakeholder Group Charter:

    a. The gTLD Registries Constituency shall be assigned to the Registries Stakeholder Group;

    b. The Registrars Constituency shall be assigned to the Registrars Stakeholder Group;

    c. The Business Constituency shall be assigned to the Commercial Stakeholder Group;

    d. The Intellectual Property Constituency shall be assigned to the Commercial Stakeholder Group;

    e. The Internet Services Providers Constituency shall be assigned to the Commercial

SER053

Stakeholder Group; and

f. The Non-Commercial Users Constituency shall be assigned to the Non-Commercial Stakeholder Group.

2. Each GNSO Constituency described in paragraph 1 of this subsection shall continue operating substantially as before and no Constituency official, working group, or other activity shall be changed until further action of the Constituency, provided that each GNSO Constituency described in paragraph 1 (c-f) shall submit to the ICANN Secretary a new or revised Charter inclusive of its operating procedures, adopted according to the Constituency's processes and consistent with these Bylaws Amendments, no later than the ICANN meeting in October 2009, or another date as the Board may designate by resolution.

3. Prior to the commencement of the ICANN meeting in October 2009, or another date the Board may designate by resolution, the GNSO Council shall consist of its current Constituency structure and officers as described in Article X, Section 3(1) of the Bylaws (as amended and restated on 29 October 1999 and amended through 20 March 2009 (the "Old Bylaws")). Thereafter, the composition of the GNSO Council shall be as provided in these Bylaws, as they may be amended from time to time. All committees, task forces, working groups, drafting committees, and similar groups established by the GNSO Council and in existence immediately before the adoption of this Transition Article shall continue in existence with the same charters, membership, and activities, subject to any change by action of the GNSO Council or ICANN Board.

4. Beginning with the commencement of the ICANN Meeting in October 2009, or another date the Board may designate by resolution (the "Effective Date of the Transition"), the GNSO Council seats shall be assigned as follows:

a. The three seats currently assigned to the Registry Constituency shall be reassigned as three seats of the Registries Stakeholder Group;

b. The three seats currently assigned to the Registrar Constituency shall be reassigned as three seats of the Registrars Stakeholder Group;

c. The three seats currently assigned to each of the Business Constituency, the Intellectual Property Constituency, and the Internet Services Provider Constituency (nine total) shall be decreased to be six seats of the Commercial Stakeholder Group;

d. The three seats currently assigned to the Non-Commercial Users Constituency shall be increased to be six seats of the Non-Commercial Stakeholder Group;

e. The three seats currently selected by the Nominating Committee shall be assigned by the Nominating Committee as follows: one voting member to the Contracted Party House, one voting member to the Non-Contracted Party House, and one non-voting member assigned to the GNSO Council at large.

Representatives on the GNSO Council shall be appointed or elected consistent with the provisions in each applicable Stakeholder Group Charter, approved by the Board, and sufficiently in advance of the October 2009 ICANN Meeting that will permit those representatives to act in their official capacities at the start of said meeting.

5. The GNSO Council, as part of its Restructure Implementation Plan, will document: (a) how vacancies, if any, will be handled during the transition period; (b) for each Stakeholder Group, how each assigned Council seat to take effect at the 2009 ICANN annual meeting will be filled, whether through a continuation of an existing term or a new election or appointment; (c) how it plans to address staggered terms such that the new GNSO Council preserves as much continuity as reasonably possible; and (d) the effect of Bylaws term limits on each Council member.

6. As soon as practical after the commencement of the ICANN meeting in October 2009, or another date the Board may designate by resolution, the GNSO Council shall, in accordance with Article X, Section 3(7) and its GNSO Operating Procedures, elect officers and give the ICANN Secretary written notice of its selections.

EXHIBIT B
51

Case: 13-55553     11/08/2013     ID: 8857379     DktEntry: 15-2     Page: 57 of 74

## Section 6. PROTOCOL SUPPORTING ORGANIZATION

The Protocol Supporting Organization referred to in the Old Bylaws is discontinued.

## Section 7. ADVISORY COMMITTEES AND TECHNICAL LIAISON GROUP

1. Upon the adoption of the New Bylaws, the Governmental Advisory Committee shall continue in operation according to its existing operating principles and practices, until further action of the committee. The Governmental Advisory Committee may designate liaisons to serve with other ICANN bodies as contemplated by the New Bylaws by providing written notice to the ICANN Secretary. Promptly upon the adoption of this Transition Article, the Governmental Advisory Committee shall notify the ICANN Secretary of the person selected as its delegate to the Nominating Committee, as set forth in Article VII, Section 2 of the New Bylaws.

2. The organizations designated as members of the Technical Liaison Group under Article XI-A, Section 2(2) of the New Bylaws shall each designate the two individual technical experts described in Article XI-A, Section 2(6) of the New Bylaws, by providing written notice to the ICANN Secretary. As soon as feasible, the delegate from the Technical Liaison Group to the Nominating Committee shall be selected according to Article XI-A, Section 2(7) of the New Bylaws.

3. Upon the adoption of the New Bylaws, the Security and Stability Advisory Committee shall continue in operation according to its existing operating principles and practices, until further action of the committee. Promptly upon the adoption of this Transition Article, the Security and Stability Advisory Committee shall notify the ICANN Secretary of the person selected as its delegate to the Nominating Committee, as set forth in Article VII, Section 2(4) of the New Bylaws.

4. Upon the adoption of the New Bylaws, the Root Server System Advisory Committee shall continue in operation according to its existing operating principles and practices, until further action of the committee. Promptly upon the adoption of this Transition Article, the Root Server Advisory Committee shall notify the ICANN Secretary of the person selected as its delegate to the Nominating Committee, as set forth in Article VII, Section 2(3) of the New Bylaws.

5. At-Large Advisory Committee

   a. There shall exist an Interim At-Large Advisory Committee until such time as ICANN recognizes, through the entry of a Memorandum of Understanding, all of the Regional At-Large Organizations (RALOs) identified in Article XI, Section 2(4) of the New Bylaws. The Interim At-Large Advisory Committee shall be composed of (i) ten individuals (two from each ICANN region) selected by the ICANN Board following nominations by the At-Large Organizing Committee and (ii) five additional individuals (one from each ICANN region) selected by the initial Nominating Committee as soon as feasible in accordance with the principles established in Article VII, Section 5 of the New Bylaws. The initial Nominating Committee shall designate two of these individuals to serve terms until the conclusion of the ICANN annual meeting in 2004 and three of these individuals to serve terms until the conclusion of the ICANN annual meeting in 2005.

   b. Upon the entry of each RALO into such a Memorandum of Understanding, that entity shall be entitled to select two persons who are citizens and residents of that Region to be members of the At-Large Advisory Committee established by Article XI, Section 2(4) of the New Bylaws. Upon the entity's written notification to the ICANN Secretary of such selections, those persons shall immediately assume the seats held until that notification by the Interim At-Large Advisory Committee members previously selected by the Board from the RALO's region.

   c. Upon the seating of persons selected by all five RALOs, the Interim At-Large Advisory Committee shall become the At-Large Advisory Committee, as established by Article XI, Section 2(4) of the New Bylaws. The five individuals selected to the Interim At-Large Advisory Committee by the Nominating Committee shall become members of the At-Large Advisory Committee for the remainder of the terms for which they were selected.

   d. Promptly upon its creation, the Interim At-Large Advisory Committee shall notify the ICANN

**EXHIBIT B**

52

SER055

Secretary of the persons selected as its delegates to the Nominating Committee, as set forth in Article VII, Section 2(6) of the New Bylaws.

## Section 8. OFFICERS

ICANN officers (as defined in Article XIII of the New Bylaws) shall be elected by the then-existing Board of ICANN at the annual meeting in 2002 to serve until the annual meeting in 2003.

## Section 9. GROUPS APPOINTED BY THE PRESIDENT

Notwithstanding the adoption or effectiveness of the New Bylaws, task forces and other groups appointed by the ICANN President shall continue unchanged in membership, scope, and operation until changes are made by the President.

## Section 10. CONTRACTS WITH ICANN

Notwithstanding the adoption or effectiveness of the New Bylaws, all agreements, including employment and consulting agreements, entered by ICANN shall continue in effect according to their terms.

---

# Annex A: GNSO Policy Development Process

The following process shall govern the GNSO policy development process ("PDP") until such time as modifications are recommended to and approved by the ICANN Board of Directors ("Board"). The role of the GNSO is outlined in Article X of these Bylaws. If the GNSO is conducting activities that are not intended to result in a Consensus Policy, the Council may act through other processes.

Section 1. **Required Elements of a Policy Development Process**

The following elements are required at a minimum to form Consensus Policies as defined within ICANN contracts, and any other policies for which the GNSO Council requests application of this Annex A:

    a. Final Issue Report requested by the Board, the GNSO Council ("Council") or Advisory Committee, which should include at a minimum a) the proposed issue raised for consideration, b) the identity of the party submitting the issue, and c) how that party Is affected by the issue;

    b. Formal initiation of the Policy Development Process by the Council;

    c. Formation of a Working Group or other designated work method;

    d. Initial Report produced by a Working Group or other designated work method;

    e. Final Report produced by a Working Group, or other designated work method, and forwarded to the Council for deliberation;

    f. Council approval of PDP Recommendations contained in the Final Report, by the required thresholds;

    g. PDP Recommendations and Final Report shall be forwarded to the Board through a Recommendations Report approved by the Council]; and

    h. Board approval of PDP Recommendations.

Section 2. **Policy Development Process Manual**

The GNSO shall maintain a Policy Development Process Manual (PDP Manual) within the operating procedures of the GNSO maintained by the GNSO Council. The PDP Manual shall contain specific additional guidance on completion of all elements of a PDP, including those elements that are not otherwise defined in these Bylaws. The PDP Manual and any

SER056
1/20/2012

Case: 13-55553    11/08/2013    ID: 8857379    DktEntry: 15-2    Page: 59 of 74

amendments thereto are subject to a twenty-one (21) day public comment period, as well as Board oversight and review, as specified at Article X, Section 3.6.

Section 3. **Requesting an Issue Report**

*Board Request.* The Board may request an Issue Report by instructing the GNSO Council ("Council") to begin the process outlined the PDP Manual. In the event the Board makes a request for an Issue Report, the Board should provide a mechanism by which the GNSO Council can consult with the Board to provide information on the scope, timing, and priority of the request for an Issue Report.

*Council Request.* The GNSO Council may request an Issue Report by a vote of at least one-fourth (1/4) of the members of the Council of each House or a majority of one House.

*Advisory Committee Request.* An Advisory Committee may raise an issue for policy development by action of such committee to request an Issue Report, and transmission of that request to the Staff Manager and GNSO Council.

Section 4. **Creation of an Issue Report**

Within forty-five (45) calendar days after receipt of either (i) an instruction from the Board; (ii) a properly supported motion from the GNSO Council; or (iii) a properly supported motion from an Advisory Committee, the Staff Manager will create a report (a "Preliminary Issue Report"). In the event the Staff Manager determines that more time is necessary to create the Preliminary Issue Report, the Staff Manager may request an extension of time for completion of the Preliminary Issue Report.

The following elements should be considered in the Issue Report:

    a) The proposed issue raised for consideration;

    b) The identity of the party submitting the request for the Issue Report;

    c) How that party is affected by the issue, if known;

    d) Support for the issue to initiate the PDP, if known;

    e) The opinion of the ICANN General Counsel regarding whether the issue proposed for consideration within the Policy Development Process is properly within the scope of the ICANN's mission, policy process and more specifically the role of the GNSO as set forth in the Bylaws.

    f) The opinion of ICANN Staff as to whether the Council should initiate the PDP on the issue

Upon completion of the Preliminary Issue Report, the Preliminary Issue Report shall be posted on the ICANN website for a public comment period of no less than 30 days

The Staff Manager is responsible for drafting a summary and analysis of the public comments received on the Preliminary Issue Report and producing a Final Issue Report based upon the comments received. The Staff Manager should forward the Final Issue Report, along with any summary and analysis of the public comments received, to the Chair of the GNSO Council for consideration for initiation of a PDP.

Section 5. **Initiation of the PDP**

The Council may initiate the PDP as follows:

*Board Request*: If the Board requested an Issue Report, the Council, within the timeframe set forth in the PDP Manual, shall initiate a PDP. No vote is required for such action.

*GNSO Council or Advisory Committee Requests*: The Council may only initiate the PDP by a vote of the Council. Initiation of a PDP requires a vote as set forth in Article X, Section 3, paragraph 9(b) and (c) in favor of initiating the PDP.

Section 6. **Reports**

An Initial Report should be delivered to the GNSO Council and posted for a public comment period of not less than 30 days, which time may be extended in accordance with the PDP Manual. Following the review of the comments received and, if required, additional deliberations, a Final Report shall be produced for transmission to the Council.

Section 7. **Council Deliberation**

Upon receipt of a Final Report, whether as the result of a working group or otherwise, the Council chair will (i) distribute the Final Report to all Council members; and (ii) call for Council deliberation on the matter in accordance with the PDP Manual.

The Council approval process is set forth in Article X, Section 3, paragraph 9(d) through (g), as supplemented by the PDP Manual.

Section 8. **Preparation of the Board Report**

If the PDP recommendations contained in the Final Report are approved by the GNSO Council, a Recommendations Report shall be approved by the GNSO Council for delivery to the ICANN Board.

Section 9. **Board Approval Processes**

The Board will meet to discuss the GNSO Council recommendation as soon as feasible, but preferably not later than the second meeting after receipt of the Board Report from the Staff Manager. Board deliberation on the PDP Recommendations contained within the Recommendations Report shall proceed as follows:

a. Any PDP Recommendations approved by a GNSO Supermajority Vote shall be adopted by the Board unless, by a vote of more than two-thirds (2/3) of the Board, the Board determines that such policy is not in the best interests of the ICANN community or ICANN. If the GNSO Council recommendation was approved by less than a GNSO Supermajority Vote, a majority vote of the Board will be sufficient to determine that such policy is not in the best interests of the ICANN community or ICANN.

b. In the event that the Board determines, in accordance with paragraph a above, that the policy recommended by a GNSO Supermajority Vote or less than a GNSO Supermajority vote is not in the best interests of the ICANN community or ICANN (the Corporation), the Board shall (i) articulate the reasons for its determination in a report to the Council (the "Board Statement"); and (ii) submit the Board Statement to the Council.

c. The Council shall review the Board Statement for discussion with the Board as soon as feasible after the Council's receipt of the Board Statement. The Board shall determine the method (e.g., by teleconference, e-mail, or otherwise) by which the Council and Board will discuss the Board Statement.

d. At the conclusion of the Council and Board discussions, the Council shall meet to affirm or modify its recommendation, and communicate that conclusion (the "Supplemental Recommendation") to the Board, including an explanation for the then-current recommendation. In the event that the Council is able to reach a GNSO Supermajority Vote on the Supplemental Recommendation, the Board shall adopt the recommendation unless more than two-thirds (2/3) of the Board determines that such policy is not in the interests of the ICANN community or ICANN. For any Supplemental Recommendation approved by less than a GNSO Supermajority Vote, a majority vote of the Board shall be sufficient to determine that the policy in the Supplemental Recommendation is not in the best interest of the ICANN community or ICANN.

Section 10. **Implementation of Approved Policies**

Upon a final decision of the Board adopting the policy, the Board shall, as appropriate, give authorization or direction to ICANN staff to work with the GNSO Council to create an implementation plan based upon the implementation recommendations identified in the Final Report, and to implement the policy. The GNSO Council may, but is not required to, direct the creation of an implementation review team to assist in implementation of the policy.

Section 11. **Maintenance of Records**

EXHIBIT B
55

SER058
9/20/2012

Case: 13-55553   11/08/2013     ID: 8857379    DktEntry: 15-2    Page: 61 of 74
Case 2:12-cv-08676-PA-PLA   Document 20   Filed 11/30/12   Page 59 of 72   Page ID #:191

Throughout the PDP, from policy suggestion to a final decision by the Board, ICANN will maintain on the Website, a status web page detailing the progress of each PDP issue. Such status page will outline the completed and upcoming steps in the PDP process, and contain links to key resources (e.g. Reports, Comments Fora, WG Discussions, etc.).

Section 12. **Additional Definitions**

"Comment Site", "Comment Forum", "Comments For a" and "Website" refer to one or more websites designated by ICANN on which notifications and comments regarding the PDP will be posted.

"Supermajority Vote" means a vote of more than sixty-six (66) percent of the members present at a meeting of the applicable body, with the exception of the GNSO Council.

"Staff Manager" means an ICANN staff person(s) who manages the PDP.

"GNSO Supermajority Vote" shall have the meaning set forth in the Bylaws.

Section 13. **Applicability**

The procedures of this Annex A shall be applicable to all requests for Issue Reports and PDPs initiated after 8 December 2011. For all ongoing PDPs initiated prior to 8 December 2011, the Council shall determine the feasibility of transitioning to the procedures set forth in this Annex A for all remaining steps within the PDP. If the Council determines that any ongoing PDP cannot be feasibly transitioned to these updated procedures, the PDP shall be concluded according to the procedures set forth in Annex A in force on 7 December 2011.

---

# Annex B: ccNSO Policy-Development Process (ccPDP)

The following process shall govern the ccNSO policy-development process ("PDP").

## 1. Request for an Issue Report

An Issue Report may be requested by any of the following:

> a. *Council.* The ccNSO Council (in this Annex B, the "Council") may call for the creation of an Issue Report by an affirmative vote of at least seven of the members of the Council present at any meeting or voting by e-mail.

> b. *Board.* The ICANN Board may call for the creation of an Issue Report by requesting the Council to begin the policy-development process.

> c. *Regional Organization.* One or more of the Regional Organizations representing ccTLDs in the ICANN recognized Regions may call for creation of an Issue Report by requesting the Council to begin the policy-development process.

> d. *ICANN Supporting Organization or Advisory Committee.* An ICANN Supporting Organization or an ICANN Advisory Committee may call for creation of an Issue Report by requesting the Council to begin the policy-development process.

> e. *Members of the ccNSO.* The members of the ccNSO may call for the creation of an Issue Report by an affirmative vote of at least ten members of the ccNSO present at any meeting or voting by e-mail.

Any request for an Issue Report must be in writing and must set out the issue upon which an Issue Report is requested in sufficient detail to enable the Issue Report to be prepared. It shall be open to the Council to request further information or undertake further research or investigation for the purpose of determining whether or not the requested Issue Report should be created.

SER059

**2. Creation of the Issue Report and Initiation Threshold**

Within seven days after an affirmative vote as outlined in Item 1(a) above or the receipt of a request as outlined in Items 1 (b), (c), or (d) above the Council shall appoint an Issue Manager. The Issue Manager may be a staff member of ICANN (in which case the costs of the Issue Manager shall be borne by ICANN) or such other person or persons selected by the Council (in which case the ccNSO shall be responsible for the costs of the Issue Manager).

Within fifteen (15) calendar days after appointment (or such other time as the Council shall, in consultation with the Issue Manager, deem to be appropriate), the Issue Manager shall create an Issue Report. Each Issue Report shall contain at least the following:

  a. The proposed issue raised for consideration;

  b. The identity of the party submitting the issue;

  c. How that party is affected by the issue;

  d. Support for the issue to initiate the PDP;

  e. A recommendation from the Issue Manager as to whether the Council should move to initiate the PDP for this issue (the "Manager Recommendation"). Each Manager Recommendation shall include, and be supported by, an opinion of the ICANN General Counsel regarding whether the issue is properly within the scope of the ICANN policy process and within the scope of the ccNSO. In coming to his or her opinion, the General Counsel shall examine whether:

    1) The issue is within the scope of ICANN's mission statement;

    2) Analysis of the relevant factors according to Article IX, Section 6(2) and Annex C affirmatively demonstrates that the issue is within the scope of the ccNSO;

  In the event that the General Counsel reaches an opinion in the affirmative with respect to points 1 and 2 above then the General Counsel shall also consider whether the issue:

    3) Implicates or affects an existing ICANN policy;

    4) Is likely to have lasting value or applicability, albeit with the need for occasional updates, and to establish a guide or framework for future decision-making.

  In all events, consideration of revisions to the ccPDP (this Annex B) or to the scope of the ccNSO (Annex C) shall be within the scope of ICANN and the ccNSO.

  In the event that General Counsel is of the opinion the issue is not properly within the scope of the ccNSO Scope, the Issue Manager shall inform the Council of this opinion. If after an analysis of the relevant factors according to Article IX, Section 6 and Annex C a majority of 10 or more Council members is of the opinion the issue is within scope the Chair of the ccNSO shall inform the Issue Manager accordingly. General Counsel and the ccNSO Council shall engage in a dialogue according to agreed rules and procedures to resolve the matter. In the event no agreement is reached between General Counsel and the Council as to whether the issue is within or outside Scope of the ccNSO then by a vote of 15 or more members the Council may decide the issue is within scope. The Chair of the ccNSO shall inform General Counsel and the Issue Manager accordingly. The Issue Manager shall then proceed with a recommendation whether or not the Council should move to initiate the PDP including both the opinion and analysis of General Counsel and Council in the Issues Report.

  f. In the event that the Manager Recommendation is in favor of initiating the PDP, a proposed time line for conducting each of the stages of PDP outlined herein (PDP Time Line).

  g. If possible, the issue report shall indicate whether the resulting output is likely to result in a policy to be approved by the ICANN Board. In some circumstances, it will not be possible to do this until substantive discussions on the issue have taken place. In these cases, the issue report should indicate this

**EXHIBIT B**

57

SER060     /30/2012

uncertainty. Upon completion of the Issue Report, the Issue Manager shall distribute it to the full Council for a vote on whether to initiate the PDP.

**3. Initiation of PDP**

The Council shall decide whether to initiate the PDP as follows:

a. Within 21 days after receipt of an Issue Report from the Issue Manager, the Council shall vote on whether to initiate the PDP. Such vote should be taken at a meeting held in any manner deemed appropriate by the Council, including in person or by conference call, but if a meeting is not feasible the vote may occur by e-mail.

b. A vote of ten or more Council members in favor of initiating the PDP shall be required to initiate the PDP provided that the Issue Report states that the issue is properly within the scope of the ICANN mission statement and the ccNSO Scope.

**4. Decision Whether to Appoint Task Force; Establishment of Time Line**

At the meeting of the Council where the PDP has been initiated (or, where the Council employs a vote by e-mail, in that vote) pursuant to Item 3 above, the Council shall decide, by a majority vote of members present at the meeting (or voting by e-mail), whether or not to appoint a task force to address the issue. If the Council votes:

a. In favor of convening a task force, it shall do so in accordance with Item 7 below.

b. Against convening a task force, then it shall collect information on the policy issue in accordance with Item 8 below.

The Council shall also, by a majority vote of members present at the meeting or voting by e-mail, approve or amend and approve the PDP Time Line set out in the Issue Report.

**5. Composition and Selection of Task Forces**

a. Upon voting to appoint a task force, the Council shall invite each of the Regional Organizations (see Article IX, Section 6) to appoint two individuals to participate in the task force (the "Representatives"). Additionally, the Council may appoint up to three advisors (the "Advisors") from outside the ccNSO and, following formal request for GAC participation in the Task Force, accept up to two Representatives from the Governmental Advisory Committee to sit on the task force. The Council may increase the number of Representatives that may sit on a task force in its discretion in circumstances that it deems necessary or appropriate.

b. Any Regional Organization wishing to appoint Representatives to the task force must provide the names of the Representatives to the Issue Manager within ten (10) calendar days after such request so that they are included on the task force. Such Representatives need not be members of the Council, but each must be an individual who has an interest, and ideally knowledge and expertise, in the subject matter, coupled with the ability to devote a substantial amount of time to the task force's activities.

c. The Council may also pursue other actions that it deems appropriate to assist in the PDP, including appointing a particular individual or organization to gather information on the issue or scheduling meetings for deliberation or briefing. All such information shall be submitted to the Issue Manager in accordance with the PDP Time Line.

**6. Public Notification of Initiation of the PDP and Comment Period**

After initiation of the PDP, ICANN shall post a notification of such action to the Website and to the other ICANN Supporting Organizations and Advisory Committees. A comment period (in accordance with the PDP Time Line, and ordinarily at least 21 days long) shall be commenced for the issue. Comments shall be accepted from ccTLD managers, other Supporting Organizations, Advisory Committees, and from the public. The Issue Manager, or some other designated Council representative shall review the comments and incorporate them into a report (the "Comment Report") to be included in either the Preliminary Task Force Report or the Initial Report, as applicable.

EXHIBIT B
58

SER061

**7. Task Forces**

a. *Role of Task Force.* If a task force is created, its role shall be responsible for (i) gathering information documenting the positions of the ccNSO members within the Geographic Regions and other parties and groups; and (ii) otherwise obtaining relevant information that shall enable the Task Force Report to be as complete and informative as possible to facilitate the Council's meaningful and informed deliberation.

The task force shall not have any formal decision-making authority. Rather, the role of the task force shall be to gather information that shall document the positions of various parties or groups as specifically and comprehensively as possible, thereby enabling the Council to have a meaningful and informed deliberation on the issue.

b. *Task Force Charter or Terms of Reference.* The Council, with the assistance of the Issue Manager, shall develop a charter or terms of reference for the task force (the "Charter") within the time designated in the PDP Time Line. Such Charter shall include:

1. The issue to be addressed by the task force, as such issue was articulated for the vote before the Council that initiated the PDP;

2. The specific time line that the task force must adhere to, as set forth below, unless the Council determines that there is a compelling reason to extend the timeline; and

3. Any specific instructions from the Council for the task force, including whether or not the task force should solicit the advice of outside advisors on the issue.

The task force shall prepare its report and otherwise conduct its activities in accordance with the Charter. Any request to deviate from the Charter must be formally presented to the Council and may only be undertaken by the task force upon a vote of a majority of the Council members present at a meeting or voting by e-mail. The quorum requirements of Article IX, Section 3(14) shall apply to Council actions under this Item 7(b).

c. *Appointment of Task Force Chair.* The Issue Manager shall convene the first meeting of the task force within the time designated in the PDP Time Line. At the initial meeting, the task force members shall, among other things, vote to appoint a task force chair. The chair shall be responsible for organizing the activities of the task force, including compiling the Task Force Report. The chair of a task force need not be a member of the Council.

d. *Collection of Information.*

1. *Regional Organization Statements.* The Representatives shall each be responsible for soliciting the position of the Regional Organization for their Geographic Region, at a minimum, and may solicit other comments, as each Representative deems appropriate, including the comments of the ccNSO members in that region that are not members of the Regional Organization, regarding the issue under consideration. The position of the Regional Organization and any other comments gathered by the Representatives should be submitted in a formal statement to the task force chair (each, a "Regional Statement") within the time designated in the PDP Time Line. Every Regional Statement shall include at least the following:

(i) If a Supermajority Vote (as defined by the Regional Organization) was reached, a clear statement of the Regional Organization's position on the issue;

(ii) If a Supermajority Vote was not reached, a clear statement of all positions espoused by the members of the Regional Organization;

(iii) A clear statement of how the Regional Organization arrived at its position(s). Specifically, the statement should detail specific meetings, teleconferences, or other means of deliberating an issue, and a list of all members who participated or otherwise submitted their views;

**EXHIBIT B**
**59**

Case: 13-55553    11/08/2013    ID: 8857379    DktEntry: 15-2    Page: 65 of 74

(iv) A statement of the position on the issue of any ccNSO members that are not members of the Regional Organization;

(v) An analysis of how the issue would affect the Region, including any financial impact on the Region; and

(vi) An analysis of the period of time that would likely be necessary to implement the policy.

2. *Outside Advisors.* The task force may, in its discretion, solicit the opinions of outside advisors, experts, or other members of the public. Such opinions should be set forth in a report prepared by such outside advisors, and (i) clearly labeled as coming from outside advisors; (ii) accompanied by a detailed statement of the advisors' (a) qualifications and relevant experience and (b) potential conflicts of interest. These reports should be submitted in a formal statement to the task force chair within the time designated in the PDP Time Line.

e. *Task Force Report.* The chair of the task force, working with the Issue Manager, shall compile the Regional Statements, the Comment Report, and other information or reports, as applicable, into a single document ("Preliminary Task Force Report") and distribute the Preliminary Task Force Report to the full task force within the time designated in the PDP Time Line. The task force shall have a final task force meeting to consider the issues and try and reach a Supermajority Vote. After the final task force meeting, the chair of the task force and the Issue Manager shall create the final task force report (the "Task Force Report") and post it on the Website and to the other ICANN Supporting Organizations and Advisory Committees. Each Task Force Report must include:

1. A clear statement of any Supermajority Vote (being 66% of the task force) position of the task force on the issue;

2. If a Supermajority Vote was not reached, a clear statement of all positions espoused by task force members submitted within the time line for submission of constituency reports. Each statement should clearly indicate (i) the reasons underlying the position and (ii) the Regional Organizations that held the position;

3. An analysis of how the issue would affect each Region, including any financial impact on the Region;

4. An analysis of the period of time that would likely be necessary to implement the policy; and

5. The advice of any outside advisors appointed to the task force by the Council, accompanied by a detailed statement of the advisors' (i) qualifications and relevant experience and (ii) potential conflicts of interest.

## 8. Procedure if No Task Force is Formed

a. If the Council decides not to convene a task force, each Regional Organization shall, within the time designated in the PDP Time Line, appoint a representative to solicit the Region's views on the issue. Each such representative shall be asked to submit a Regional Statement to the Issue Manager within the time designated in the PDP Time Line.

b. The Council may, in its discretion, take other steps to assist in the PDP, including, for example, appointing a particular individual or organization, to gather information on the issue or scheduling meetings for deliberation or briefing. All such information shall be submitted to the Issue Manager within the time designated in the PDP Time Line.

c. The Council shall formally request the Chair of the GAC to offer opinion or advice.

d. The Issue Manager shall take all Regional Statements, the Comment Report, and other information and compile (and post on the Website) an Initial Report within the time designated in the PDP Time Line. Thereafter, the Issue Manager shall, in accordance with Item 9 below, create a Final Report.

## 9. Comments to the Task Force Report or Initial Report

a. A comment period (in accordance with the PDP Time Line, and ordinarily at least 21 days long) shall be opened for comments on the Task Force Report or Initial Report. Comments shall be accepted from ccTLD managers, other Supporting Organizations, Advisory Committees, and from the public. All comments shall include the author's name, relevant experience, and interest in the issue.

b. At the end of the comment period, the Issue Manager shall review the comments received and may, in the Issue Manager's reasonable discretion, add appropriate comments to the Task Force Report or Initial Report, to prepare the "Final Report". The Issue Manager shall not be obligated to include all comments made during the comment period, nor shall the Issue Manager be obligated to include all comments submitted by any one individual or organization.

c. The Issue Manager shall prepare the Final Report and submit it to the Council chair within the time designated in the PDP Time Line.

## 10. Council Deliberation

a. Upon receipt of a Final Report, whether as the result of a task force or otherwise, the Council chair shall (i) distribute the Final Report to all Council members; (ii) call for a Council meeting within the time designated in the PDP Time Line wherein the Council shall work towards achieving a recommendation to present to the Board; and (iii) formally send to the GAC Chair an invitation to the GAC to offer opinion or advice. Such meeting may be held in any manner deemed appropriate by the Council, including in person or by conference call. The Issue Manager shall be present at the meeting.

b. The Council may commence its deliberation on the issue prior to the formal meeting, including via in-person meetings, conference calls, e-mail discussions, or any other means the Council may choose.

c. The Council may, if it so chooses, solicit the opinions of outside advisors at its final meeting. The opinions of these advisors, if relied upon by the Council, shall be (i) embodied in the Council's report to the Board, (ii) specifically identified as coming from an outside advisor; and (iii) accompanied by a detailed statement of the advisor's (a) qualifications and relevant experience and (b) potential conflicts of interest.

## 11. Recommendation of the Council

In considering whether to make a recommendation on the issue (a "Council Recommendation"), the Council shall seek to act by consensus. If a minority opposes a consensus position, that minority shall prepare and circulate to the Council a statement explaining its reasons for opposition. If the Council's discussion of the statement does not result in consensus, then a recommendation supported by 14 or more of the Council members shall be deemed to reflect the view of the Council, and shall be conveyed to the Members as the Council's Recommendation. Notwithstanding the foregoing, as outlined below, all viewpoints expressed by Council members during the PDP must be included in the Members Report.

## 12. Council Report to the Members

In the event that a Council Recommendation is adopted pursuant to Item 11 then the Issue Manager shall, within seven days after the Council meeting, incorporate the Council's Recommendation together with any other viewpoints of the Council members into a Members Report to be approved by the Council and then to be submitted to the Members (the "Members Report"). The Members Report must contain at least the following:

a. A clear statement of the Council's recommendation;

b. The Final Report submitted to the Council; and

c. A copy of the minutes of the Council's deliberation on the policy issue (see Item 10), including all the opinions expressed during such deliberation, accompanied by a description of who expressed such opinions.

## 13. Members Vote

SER064   6/20/2012

Case: 13-55553    11/08/2013    ID: 8857379    DktEntry: 15-2    Page: 67 of 74
Case 2:12-cv-08676-PA-PLA    Document 20    Filed 11/30/12    Page 65 of 72    Page ID #:197

Following the submission of the Members Report and within the time designated by the PDP Time Line, the ccNSO members shall be given an opportunity to vote on the Council Recommendation. The vote of members shall be electronic and members' votes shall be lodged over such a period of time as designated in the PDP Time Line (at least 21 days long).

In the event that at least 50% of the ccNSO members lodge votes within the voting period, the resulting vote will be be employed without further process. In the event that fewer than 50% of the ccNSO members lodge votes in the first round of voting, the first round will not be employed and the results of a final, second round of voting, conducted after at least thirty days notice to the ccNSO members, will be employed if at least 50% of the ccNSO members lodge votes. In the event that more than 66% of the votes received at the end of the voting period shall be in favor of the Council Recommendation, then the recommendation shall be conveyed to the Board in accordance with Item 14 below as the ccNSO Recommendation.

**14. Board Report**

The Issue Manager shall within seven days after a ccNSO Recommendation being made in accordance with Item 13 incorporate the ccNSO Recommendation into a report to be approved by the Council and then to be submitted to the Board (the "Board Report"). The Board Report must contain at least the following:

    a. A clear statement of the ccNSO recommendation;

    b. The Final Report submitted to the Council; and

    c. the Members' Report.

**15. Board Vote**

    a. The Board shall meet to discuss the ccNSO Recommendation as soon as feasible after receipt of the Board Report from the Issue Manager, taking into account procedures for Board consideration.

    b. The Board shall adopt the ccNSO Recommendation unless by a vote of more than 66% the Board determines that such policy is not in the best interest of the ICANN community or of ICANN.

        1. In the event that the Board determines not to act in accordance with the ccNSO Recommendation, the Board shall (i) state its reasons for its determination not to act in accordance with the ccNSO Recommendation in a report to the Council (the "Board Statement"); and (ii) submit the Board Statement to the Council.

        2. The Council shall discuss the Board Statement with the Board within thirty days after the Board Statement is submitted to the Council. The Board shall determine the method (e.g., by teleconference, e-mail, or otherwise) by which the Council and Board shall discuss the Board Statement. The discussions shall be held in good faith and in a timely and efficient manner, to find a mutually acceptable solution.

        3. At the conclusion of the Council and Board discussions, the Council shall meet to affirm or modify its Council Recommendation. A recommendation supported by 14 or more of the Council members shall be deemed to reflect the view of the Council (the Council's "Supplemental Recommendation"). That Supplemental Recommendation shall be conveyed to the Members in a Supplemental Members Report, including an explanation for the Supplemental Recommendation. Members shall be given an opportunity to vote on the Supplemental Recommendation under the same conditions outlined in Item 13. In the event that more than 66% of the votes cast by ccNSO Members during the voting period are in favor of the Supplemental Recommendation then that recommendation shall be conveyed to Board as the ccNSO Supplemental Recommendation and the Board shall adopt the recommendation unless by a vote of more than 66% of the Board determines that acceptance of such policy would constitute a breach of the fiduciary duties of the Board to the Company.

        4. In the event that the Board does not accept the ccNSO Supplemental Recommendation, it shall state its reasons for doing so in its final decision ("Supplemental Board Statement").

**EXHIBIT B**
**62**

5. In the event the Board determines not to accept a ccNSO Supplemental Recommendation, then the Board shall not be entitled to set policy on the issue addressed by the recommendation and the status quo shall be preserved until such time as the ccNSO shall, under the ccPDP, make a recommendation on the issue that is deemed acceptable by the Board.

## 16. Implementation of the Policy

Upon adoption by the Board of a ccNSO Recommendation or ccNSO Supplemental Recommendation, the Board shall, as appropriate, direct or authorize ICANN staff to implement the policy.

## 17. Maintenance of Records

With respect to each ccPDP for which an Issue Report is requested (see Item 1), ICANN shall maintain on the Website a status web page detailing the progress of each ccPDP, which shall provide a list of relevant dates for the ccPDP and shall also link to the following documents, to the extent they have been prepared pursuant to the ccPDP:

a. Issue Report;

b. PDP Time Line;

c. Comment Report;

d. Regional Statement(s);

e. Preliminary Task Force Report;

f. Task Force Report;

g. Initial Report;

h. Final Report;

i. Members' Report;

j. Board Report;

k. Board Statement;

l. Supplemental Members' Report; and

m. Supplemental Board Statement.

In addition, ICANN shall post on the Website comments received in electronic written form specifically suggesting that a ccPDP be initiated.

---

# Annex C: The Scope of the ccNSO

This annex describes the scope and the principles and method of analysis to be used in any further development of the scope of the ccNSO's policy-development role. As provided in Article IX, Section 6(2) of the Bylaws, that scope shall be defined according to the procedures of the ccPDP.

The scope of the ccNSO's authority and responsibilities must recognize the complex relation between ICANN and ccTLD managers/registries with regard to policy issues. This annex shall assist the ccNSO, the ccNSO Council, and the ICANN

EXHIBIT B
63

SER066

Case: 13-55553   11/08/2013   ID: 8857379   DktEntry: 15-2   Page: 69 of 74 Page 56 of 57

Board and staff in delineating relevant global policy issues.

*Policy areas*

The ccNSO's policy role should be based on an analysis of the following functional model of the DNS:

1. Data is registered/maintained to generate a zone file,

2. A zone file is in turn used in TLD name servers.

Within a TLD two functions have to be performed (these are addressed in greater detail below):

1. Entering data into a database (Data Entry Function) and

2. Maintaining and ensuring upkeep of name-servers for the TLD (Name Server Function).

These two core functions must be performed at the ccTLD registry level as well as at a higher level (IANA function and root servers) and at lower levels of the DNS hierarchy. This mechanism, as RFC 1591 points out, is recursive:

There are no requirements on sub domains of top-level domains beyond the requirements on higher-level domains themselves. That is, the requirements in this memo are applied recursively. In particular, all sub domains shall be allowed to operate their own domain name servers, providing in them whatever information the sub domain manager sees fit (as long as it is true and correct).

*The Core Functions*

1. Data Entry Function (DEF):

Looking at a more detailed level, the first function (entering and maintaining data in a database) should be fully defined by a naming policy. This naming policy must specify the rules and conditions:

(a) under which data will be collected and entered into a database or data changed (at the TLD level among others, data to reflect a transfer from registrant to registrant or changing registrar) in the database.

(b) for making certain data generally and publicly available (be it, for example, through Whois or nameservers).

2. The Name-Server Function (NSF)

The name-server function involves essential interoperability and stability issues at the heart of the domain name system. The importance of this function extends to nameservers at the ccTLD level, but also to the root servers (and root-server system) and nameservers at lower levels.

On its own merit and because of interoperability and stability considerations, properly functioning nameservers are of utmost importance to the individual, as well as to the local and the global Internet communities.

With regard to the nameserver function, therefore, policies need to be defined and established. Most parties involved, including the majority of ccTLD registries, have accepted the need for common policies in this area by adhering to the relevant RFCs, among others RFC 1591.

*Respective Roles with Regard to Policy, Responsibilities, and Accountabilities*

It is in the interest of ICANN and ccTLD managers to ensure the stable and proper functioning of the domain name system. ICANN and the ccTLD registries each have a distinctive role to play in this regard that can be defined by the relevant policies. The scope of the ccNSO cannot be established without reaching a common understanding of the allocation of authority between ICANN and ccTLD registries.

**EXHIBIT B**
64

SER067 11/27/2012

Three roles can be distinguished as to which responsibility must be assigned on any given issue:

- Policy role: i.e. the ability and power to define a policy;
- Executive role: i.e. the ability and power to act upon and implement the policy; and
- Accountability role: i.e. the ability and power to hold the responsible entity accountable for exercising its power.

Firstly, responsibility presupposes a policy and this delineates the policy role. Depending on the issue that needs to be addressed those who are involved in defining and setting the policy need to be determined and defined. Secondly, this presupposes an executive role defining the power to implement and act within the boundaries of a policy. Finally, as a counter-balance to the executive role, the accountability role needs to defined and determined.

The information below offers an aid to:

1. delineate and identify specific policy areas;

2. define and determine roles with regard to these specific policy areas.

This annex defines the scope of the ccNSO with regard to developing policies. The scope is limited to the policy role of the ccNSO policy-development process for functions and levels explicitly stated below. It is anticipated that the accuracy of the assignments of policy, executive, and accountability roles shown below will be considered during a scope-definition ccPDP process.

*Name Server Function (as to ccTLDs)*

Level 1: Root Name Servers
Policy role: IETF, RSSAC (ICANN)
Executive role: Root Server System Operators
Accountability role: RSSAC (ICANN), (US DoC-ICANN MoU)

Level 2: ccTLD Registry Name Servers in respect to interoperability
Policy role: ccNSO Policy Development Process (ICANN), for best practices a ccNSO process can be organized
Executive role: ccTLD Manager
Accountability role: part ICANN (IANA), part Local Internet Community, including local government

Level 3: User's Name Servers
Policy role: ccTLD Manager, IETF (RFC)
Executive role: Registrant
Accountability role: ccTLD Manager

*Data Entry Function (as to ccTLDs)*

Level 1: Root Level Registry
Policy role: ccNSO Policy Development Process (ICANN)
Executive role: ICANN (IANA)
Accountability role: ICANN community, ccTLD Managers, US DoC, (national authorities in some cases)

Level 2: ccTLD Registry
Policy role: Local Internet Community, including local government, and/or ccTLD Manager according to local structure
Executive role: ccTLD Manager
Accountability role: Local Internet Community, including national authorities in some cases

Level 3: Second and Lower Levels
Policy role: Registrant
Executive role: Registrant
Accountability role: Registrant, users of lower-level domain names

EXHIBIT B
65

# EXHIBIT C



## TLD Application: Unsponsored TLD Application Transmittal Form

### 15 August 2000

---

## Unsponsored TLD Application Transmittal Form

An application is hereby made to operate the registry for an unsponsored top-level domain within the Internet Domain Name System (DNS).

**B1. This application is made by:**
**[INSTRUCTION: list the full legal name, principal address, telephone and fax numbers, and e-mail address of the registry operator.]**

NAME.SPACE, INC.
11 EAST 4th St. 2nd FLOOR FRONT
NEW YORK, N.Y. 10003
212.677.4080  FAX 212.677.3603
EMAIL: info@name-space.com

**B2.** The person signing below certifies that he or she has full authority to make this application on behalf of the applicant and to make all agreements, representations, waivers, and undertakings stated in this transmittal form and accompanying materials. Copies of the documents demonstrating the authority are attached.
**[INSTRUCTION: Attach directly to this transmittal form the documentation of the authority of the person signing. Place the legend "B2: Authorization" at the top of each page of these attachments.]**

**B3.** All documents linked directly or indirectly from "TLD Application Process: Information for Applicants," posted at <http://www.icann.org/tlds/tld-application-process.htm> have been thoroughly reviewed on behalf of applicant. In particular, the following documents have been reviewed:

> **B3.1.** New TLD Application Process Overview, posted at
> <http://www.icann.org/tlds/application-process-03aug00.htm>.

> **B3.2.** New TLD Application Instructions, posted at
> <http://www.icann.org/tlds/application-instructions-15aug00.htm>.

> **B3.3.** Criteria for Assessing TLD Proposals, posted at <http://www.icann.org/tlds/tld-criteria-15aug00.htm>.

The applicant understands that failure fully to follow instructions included in these documents will be a factor negatively affecting consideration of this application.

**B4.** This application consists of the following, in addition to this transmittal form:

> **B4.1.** The Registry Operator's Proposal, with cover sheet and attachments and accompanying materials.
> **[INSTRUCTION: With this transmittal form, submit a clearly labeled and separately bound Registry Operator's Proposal prepared by the registry operator.]**

> **B4.2.** A Description of TLD Policies, with cover sheet and attachments and accompanying materials.
> **[INSTRUCTION: With this transmittal form, submit a clearly labeled and separately bound Description of TLD Policies prepared by the registry operator.]**

> **B4.3.** A Statement of Requested Confidential Treatment of Materials Submitted.
> **[INSTRUCTION: Whether or not any confidential treatment is sought, please attach the Statement of Requested Confidential Treatment directly to this transmittal form. Place the legend "A5.4: Statement of Requested Confidential Treatment of Materials Submitted" at the top of every page of the statement.]**

> **B4.4.** Fitness Disclosure of Registry Operator.
> **[INSTRUCTION: With this transmittal form, submit a clearly labeled and separately bound Fitness Disclosure prepared by

**EXHIBIT C**
66

SER070

the registry operator.]

**B5.** This application is accompanied by one or more 3 ?" floppy diskettes (IBM high density) or a CD-ROM containing files with items B4.1 and B4.2 above. Each item is provided in a common word-processing format and in HTML format.
**[INSTRUCTION: Submit the disk(s) with the application.]**

**B6.** Check one:

ꭥ This application is accompanied by a check, drawn on a United States bank and payable to the Internet Corporation for Assigned Names and Numbers (ICANN), in the amount of 50,000 United States dollars.

( ) At least five business days before submitting this application, the applicant has sent 50,000 United States dollars by wire transfer according to item 18.2 of the New TLD Application Instructions. This application is accompanied by a wire transfer receipt or other document identifying the wire transfer.

The applicant understands and agrees that this $50,000 is only an application fee to obtain consideration of this application; that the fee will not be refunded or returned in any circumstances (except if this application is not considered due to failure to reach agreement on terms for confidential treatment); that there is no understanding, assurance, or agreement that this application will be selected for negotiations toward entry of an agreement with a registry operator; or that, if this application is selected, the negotiations will lead to entry of such an agreement or establishment of a TLD as sought in this application. The applicant understands and acknowledges that ICANN has the right to reject all applications for new top-level domains that it receives and that there is no assurance that any additional top-level domain will ever be created in the future.
**[INSTRUCTION: Be sure to include a valid check drawn on a United States bank in the full amount, or documentation of the wire transfer.]**

**B7.** In the event multiple TLD strings are proposed in this application, the applicant understands (a) that all parts of the application must apply, without significant variation, to all of the strings and (b) that, if ICANN determines in its sole discretion that one or more parts (such as the Business Capabilities and Plan or the Description of TLD Policies) apply to different proposed TLD strings in a significantly different manner, the applicant may be required to elect which of the strings to pursue in this application.

**B8.** The applicant hereby authorizes ICANN to:

B8.1. contact any person, group, or entity to request, obtain, and discuss any documentation or other information that, in ICANN's sole judgment, may be pertinent to this application,

B8.2. take any other steps to verify, elaborate on, supplement, analyze, assess, investigate, or otherwise evaluate the information contained in this application or other information that, in ICANN's sole judgment, may be pertinent to this application,

B8.3. consult with persons of ICANN's choosing regarding the information in this application or otherwise coming into ICANN's possession.

**B9.** The applicant understands that difficulties encountered by ICANN in verifying, elaborating on, supplementing, analyzing, assessing, investigating, or otherwise evaluating any aspect within or related to this application may reflect negatively on the application. In consideration of ICANN's review of the application, the applicant hereby waives liability on the part of ICANN (including its officers, directors, employees, consultants, attorneys, and agents) for its (or their) actions or inaction in verifying the information provided in this application or in conducting any other aspect of its (or their) evaluation of this application. The applicant further waives liability on the part of any third parties who provide information to ICANN or its officers, directors, employees, consultants, attorneys, and agents in connection with the application.

**B10.** The applicant hereby authorizes ICANN (and its officers, directors, employees, consultants, attorneys, and agents) to publish on ICANN's web site, and to disclose or publicize in any other manner, all materials submitted to, or obtained or generated by, ICANN (or its officers, directors, employees, consultants, attorneys, and agents) in connection with the application, including ICANN's (or their) evaluations and analyses in connection with the application or ICANN's investigation or evaluation of the application, except to the extent set forth in a written and duly signed agreement between ICANN and the applicant on the terms for confidential treatment of particular materials or information submitted by applicant. The applicant grants ICANN and its officers, directors, employees, consultants, attorneys, and agents a license to use any copyright or other intellectual property that applicant may have in any portion of the application for this purpose.

**B11.** The applicant hereby gives ICANN permission to use the applicant's name and/or logo in ICANN's public announcements (including informational web pages) relating to top-level domain space expansion.

**B12.** The applicant hereby agrees, acknowledges, and represents that it has no legally enforceable right to acceptance or

EXHIBIT C
67

SER071

any other treatment of this application or to the delegation in any particular manner of any top-level domain that may be established in the authoritative DNS root. It further agrees, acknowledges, and represents that it has no legally enforceable rights in, to, or in connection with any top-level domain by virtue of its preparation or submission of this application or by virtue of ICANN's receipt of this application, ICANN's acceptance of the application fee, ICANN's consideration or other handling of this application, or statements made in connection with this or other applications ICANN receives.

B13. The applicant understands and agrees that it will acquire rights in connection with a top-level domain only in the event that it enters one or more written, duly signed agreements with ICANN, and that applicant's rights in connection with that top-level domain will be limited to those expressly stated in the written, duly signed agreements.

B14. In consideration of ICANN's review of the application:

> B14.1. the applicant, for itself and each of its officers, directors, employees, consultants, attorneys, agents, partners, and joint venturers, hereby agrees that neither ICANN, nor any of its officers, directors, employees, consultants, attorneys, and agents, shall have any liability for its/his/her receipt, consideration, evaluation, analysis, or other activities in any way connected with this application; and

> B14.2. the applicant hereby releases and forever discharges ICANN and each of its officers, directors, employees, consultants, attorneys, and agents from any and all claims and liabilities relating in any way to (a) any action or inaction by or on behalf of ICANN in connection with this application or (b) the establishment or failure to establish a new TLD.

B15. Please send an e-mail to the following address acknowledging receipt of this application:
[INSTRUCTION: Please fill in the e-mail address to which an acknowledgement should be sent.]

By signing this transmittal form, the undersigned certifies, on his or her own behalf and on behalf of the applicant, that all information contained in this application, and all supporting documents included with this application, is true and accurate to the best of his/her/its knowledge and information. The undersigned and the applicant understand that any material misstatement or misrepresentation will reflect negatively on this application and may cause cancellation of any delegation of a top-level domain based on this application.

_(signature)_
Signature

PAUL GARRIN
Name (please print)

FOUNDER / CEO
Title

NAME.SPACE, INC.
Name of Applicant

OCTOBER 6, 2000
Date

Comments concerning the layout, construction and functionality of this site
should be sent to webmaster@icann.org.

Page Updated 1-September-00.

(c) 2000 The Internet Corporation for Assigned Names and Numbers All rights reserved.

http://www.icann.org/tlds/tld-app-unsponsored-transmittal-15aug00.htm

EXHIBIT C
68

SER072